**The UNITED STATES of America, Appellant,**

v.

**The NORTHERN PAIUTE NATION et al., Appellees.**

**Appeal No. 18–72.**

United States Court of Claims.

Jan. 23, 1974.

---

Marvin E. Schneck, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for appellant.

Richmond F. Allan, Washington, D. C., for appellees. I. S. Weissbrodt, Washington, D. C., atty. of record. Abe W. Weissbrodt, Ruth W. Duhl and Weissbrodt & Weissbrodt, Washington, D. C., of counsel.

Before LARAMORE, Senior Judge, and NICHOLS and BENNETT, Judges.

NICHOLS, Judge.

This is an appeal by the United States. It calls on us to review an interlocutory determination, an order of the Indian Claims Commission, 28 Ind.Cl.Comm. 256 (1972), which holds that the defendant is liable to the plaintiffs for the resources removed (by any and all persons, apparently) from the Nevada portion of the Paviotso tract prior to the date of extinguishment of plaintiffs' aboriginal title, December 31, 1862, but after the United States acquired the area from Mexico on February 2, 1848. We have jurisdiction to conduct a review of such an interlocutory determination under 25 U.S.C. § 70s. We hold that the order is in error, and we reverse.

The appellees' original claims to and respecting the Mono, Snake and Paviot-

so tracts in California, Oregon and Nevada, were stated in the Commission's Docket No. 87. By order of April 24, 1957, the Commission severed all claims, except for extinguishment of title to aboriginal lands, into Docket 87–A, and on that date the Indians filed an amended petition which alleged that they suffered damages when the United States permitted third persons to remove minerals and timber from their lands. Thereafter, Docket No. 87 proceeded to a determination, as to the Paviotso tract in Nevada, that plaintiffs had aboriginal title, that defendant took the tract extinguishing plaintiffs' title, and that the value of the tract on the date of taking was $15,790,000. 7–A Ind.Cl.Comm. 322, 420 (1959); 7–B Ind.Cl.Comm. 615, 616 (1959); 16 Ind.Cl.Comm. 215, 340 (1965). We affirmed, 393 F.2d 786, 183 Ct.Cl. 321 (1968). What precisely was determined, by the Commission and by us, respecting the date of taking used, December 31, 1862, is not agreed and is an issue we must now decide.

The Paviotso tract included, on December 31, 1862, part of the famed Comstock Lode and that celebrated mining community, Virginia City. Mining had commenced in the area over three years earlier in mid-1859 and substantial quantities of ore had been removed before the found extinguishment date, 135,867 tons worth $9,500,000, though much more remained. According to plaintiffs, a value of $26,200,000 was mined in 1863–65 and $153,700,000 from 1866–80. A major portion of the award was due to the enhancement of the value of the tract by its mineral wealth, as then known. So much is clear from the record in Docket 87, and further details of the relevant history may be found in our decision therein. It is not so apparent whether timber was removed from this parched and desolate area, to the extent necessary for a viable claim, and it will be the task of the Commission to determine this, if relevant.

The Commission reactivated Docket 87–A after Docket 87 was finally disposed of. The opinion of Commissioner Blue that accompanies the order appealed from, indicates that defendant is liable under the "fair and honorable dealings" clause of the Act (25 U.S.C. § 70a), Clause 5 Section 2, because it sanctioned, encouraged or assisted third parties in taking and removing resources out of the Indians' lands while their aboriginal title thereto was unextinguished and outstanding. He further holds that the extinguishment date of December 31, 1862, is *res judicata* and not now open to challenge. The Commission relies, as authority, on our decision in Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778, 182 Ct.Cl. 130 (1968), and on the Commissions' in Washoe Tribe v. United States, 21 Ind. Cl.Comm. 447 (1969). The latter involved another portion of the Comstock Lode which lay west of the Paviotso tract. The Commission used the same extinguishment date and awarded damages for pre-extinguishment trespasses by miners, on the theory employed here. That case did not come before this court for review and cannot be considered to bind us now. Defendant, for reasons sufficient to it, did not appeal.

The parties debate at length whether defendant can ever be liable for pre-extinguishment trespasses against Indians who held aboriginal title. We think so broad an issue does not confront us here. This case goes off on factors peculiar to itself, and possibly to the *Washoe* decision, which we have not examined.

■ Before applying *res judicata* or collateral estoppel one must study the former decision with care. It does not bind a party to anything, fact or law, that was not actually held and decided. When one looks at the extinguishment date, as found in Docket 87, one sees that actually nothing at all was found to have happened on December 31, 1862, relevant to this lawsuit. Finding 30, establishing the taking date, recites in support a series of events stretching from 1859 to 1874. By the end of 1862, many of the Indians had expressed the desire to remain at peace (with the United States) provided a reservation be set

apart for their permanent home; the Pyramid Lake and Walker River reservations had come into operation and had been accepted by a substantial number of Indians. They were not, however, established by Executive Order until 1874. The Commission could not have supposed that any of the facts it recited respecting the end of 1862 constituted takings in and of themselves, though it used the strong word "taken" instead of the weaker one "extinguishment" used in Commissioner Blue's opinion. As to the settlement of Indians on a reservation as abandoning aboriginal lands, *see* Turtle Mountain Band of Chippewa Indians v. United States, 490 F.2d 935, 203 Ct.Cl. —— (decided today). The explanation seems and is obvious: they were laying down an average, composite, or jury verdict taking date. It was called an "average date" in the joint submission on which the Commission framed Finding 30. The Commission previously had asked the parties to try to agree on an "average date". 7 I.C.C. at 419. Such a legal shortcut is often necessary in Indian claims litigation, if it is ever to be concluded, and has the sanction of the Supreme Court. Creek Nation v. United States, 302 U.S. 620, 58 S.Ct. 384, 82 L. Ed. 482 (1938). The record was void of any single clearcut extinguishment. The miners staked their claims, the miners mined, the Indians attacked, United States troops came to the rescue of the miners, the troops defeated the Indians, the United States agents hopefully established reservations they wished the Indians to move into, but did not compel them to, some Indians nevertheless did, the Congress retroactively validated the miners' claims, vis a vis one another, and vis a vis the United States, the President at long last established the reservations. As to non-mineral portions of the tract, there was even less. It was arguable, and defendant argued, that the Indian title had never been extinguished. Somehow by the concatenation of events, at some unknown date or dates, it was. The Commission closed its eyes and picked a date; the parties, relieved, went on to prove things that could be proved. Such a composite or average date is not *res judicata* or collateral estoppel that every parcel in the Paviotso tract was taken on the composite or average date. It is so only as to what the composite or average date was.

On our review, a majority of this court took the selected date as given. Commissioner Blue quite rightly regards the writer's concurring opinion, criticizing the date, as not binding on the Commission. Our majority opinion, however, deals, as it was obliged to do, with improvements installed by the mining companies before the chosen taking date. Defendant asserted that on account of them some three and a half million dollars should be taken off the value awarded. We held that so large an adjustment would be speculative in light of the fact that many so-called improvements did not add value commensurate with their cost, and others were actually destructive of value. We said at 393 F.2d 797, 183 Ct.Cl. 340:

> The Government referred to the miners as "others," disassociating them from the United States. However, the land involved was part of the public domain which they exploited, not only without interference by the national Government, but under its implied sanction; Del Monte Mining And Milling Co. v. Last Chance Mining And Milling Co., 171 U.S. 55, 18 S.Ct. 895, 43 L.Ed. 72 (1898); Sparrow v. Strong, 3 Wall. (70 U.S.) 97, 104, 18 L.Ed. 49 (1865); they were in no sense trespassers. Mining rights were not obtainable by patent until much later. The miners originated a "mining district" in 1859 according to their custom. In 1865 and 1866 the Congress retroactively validated the rules of such districts as evidence of title to mining claims vis-a-vis other miners, 13 Stat. 441, and vis-a-vis the United States, 14 Stat. 43. The territorial legislature had purported to do this earlier. See Sparrow v. Strong, *supra*, at p. 104. In 1860 United States troops defeated what was seen as an attempt

by the Paiutes to drive the miners out of the Virginia City area. By allowing the prosecution of the claim before us, the United States adopts the miners' acts and assumes responsibility for them, however tortious they may have been in their origin. Shoshone Tribe of Indians v. United States, 299 U.S. 476, 495, 57 S.Ct. 244, 81 L.Ed. 360 (1937).

It would seem to follow that the United States stands in the shoes of the miners with respect to the improvements and is liable to the Indians to just the same extent as if its own engineers had constructed the improvements, but to no greater extent.

■ The retroactive validation of the miners' entries made the situation the same as if the United States had issued a patent to each miner before he started to dig. It is clear from this passage that for purposes of the instant claims, the miners' acts cannot now be regarded as torts of third parties. By subsequent ratification and adoption they are made acts of the United States. The significance of the *Shoshone* case, cited by us, is that it holds that when the United States adopts and ratifies a wrong against an Indian tribe, even though it was unauthorized and tortious originally, the ratification makes it an act of the United States, and the date of the wrong becomes the date of the taking.

Plaintiff in oral argument cited United States v. North American Transp. & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935 (1920), as holding that the ratification of an initially unlawful taking does not relate back. In that case, however, there was no ratification in terms. The Secretary of War simply took the property involved, without reference to the earlier unauthorized occupation, or any assumption it was valid.

■ It would seem to follow, insofar as later legislation adopted and validated the miners' entries and staking of claims, beginning in 1859, such entries, not the dates of the legislation, were the taking dates of the parcels entered upon. Such a view is perfectly consistent with an average December 31, 1862 taking since most of the Paviotso tract was never mined. The parties were given somewhat of a washout in that in Docket 87 defendant got no credit for improvements its imputed agents, the miners, constructed, and was not asked to account for their ravages. The Commission, in Docket 87–A would now go back on this where the ravages are concerned, without giving defendant the benefit of its improvements.

■ Use of an average or composite taking date for valuation does not *per se* convert into trespasses isolated entries of the taker before the average or composite date. It may be added, the Commission relied for its December 31, 1862, value largely on a "sales index of value" constructed from the transactions in stock of mining companies and in mining rights. The miners by their mining and by their speculations largely created the values awarded the Indians in Docket 87. If defendant should be liable for their ravages here, it might in fairness be credited here for the value their efforts added to the property taken. There was also evidence before the Commission in the form of estimates of the amount of mineral known to be in the land and the profit that might be derived from extracting it, but only as enhancing the value of the land, and even so, this was not the evidence that had the most weight. It would, apparently, be impossible to show that the award in Docket 87 was reduced one dollar because a claim for pre-extinguishment trespasses was awaiting separate adjudication in Docket 87–A.

If, however, it is thought that there is a conflict between the position stated above, and the Commission's Order of June 4, 1959, fixing December 31, 1862, as the date of taking, so that either *res judicata* or collateral estoppel binds us to it, defendant points out that in the Joint Submission of Valuation Dates,

which the Commission used as the basis for its June Order, the parties said:

> \* \* \* the following suggested dates are submitted for the consideration of the Commission with the understanding that neither party will be foreclosed thereby from questioning by appeal *or in any other manner* \* \* \* any order or determination which the Commission may issue concerning dates of taking. (Emphasis supplied.)

We believe, if the Commission wanted its determination of the taking date to bind the parties by *res judicata* or collateral estoppel, in the separate but related Docket 87–A, it should have rejected this Joint Submission (actually a stipulation though said not to be) and determined the taking dates by other means. Furthermore, we think this agreement estops the plaintiffs from arguing *res judicata* or collateral estoppel against defendant's position here. It is needless to press this position, however, because there is in fact no conflict.

Finally, we return to the Commission's reliance on our *Tlingit and Haida* case. That was a case of original jurisdiction under a Special Act. We did award, as separate items, damages for pre-taking trespasses, *i. e.*, for the failure of, and refusal by the United States to protect these properties from usurpation by non-Indians. There are differences between the language of the Special Act, and the general one here involved. In the Special Act we were called upon specifically to compensate for failure to protect against depredations by third parties. We need not decide whether a difference in meaning was intended. A more significant difference for present purposes is that in *Tlingit and Haida* the takings were none of them averages or composites of numerous acts, including the acts relied on as trespasses. They were all specific statutes, executive orders, or patents. Dates were stipulated except as

to one tract. None of the statutes, orders, or patents were viewed as retroactively validating the acts of the depredators and making them acts of the United States. Only a dissent said they should have been. The legislation that confirmed the titles of the Nevada miners was entirely different in its effect, at least as construed by the Supreme Court in the cases we cited in our first *Northern Paiute* decision, quoted *supra.*

It therefore seems clear that the decision below is in error to the extent it would allow recovery for alleged trespasses by miners before December 31, 1862, where the title of such miners was afterwards retroactively validated. However, there may have been some mining by miners whose title was not retroactively validated, and the minings remained tortious trespasses. The findings in Docket 87 reflect that there was much litigation as to mining titles, in which, of course, there must have been losers. Moreover, a quantity of timber of Indian ownership was cut for timbering the mines. We think, if plaintiffs wish to develop facts along those lines, they should be allowed to do so. They would have to show responsibility in the United States in some other manner than the retroactive validation shown here. It may be these claims would not be maintainable under defendant's broad view as to the nature of aboriginal title. The issue is mooted, for the case now before us, by our holding on narrower grounds, and should not be prematurely decided because of the mere possibility it may arise again on new findings as to the classes of trespasses noted. The claims may fail on entirely different grounds or may be settled.

Accordingly, the Order of the Indian Claims Commission under review is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.