WESTERN SHOSHONE LEGAL DE-
FENSE AND EDUCATION ASSOCIA-
TION, and Frank Temoke, Appellants,

v.

The UNITED STATES and the Western
Shoshone Identifiable Group, Represent-
ed by the Temoak Bands of Western Sho-
shone Indians, Nevada, Appellees.

Appeal No. 3–75.

United States Court of Claims.

Feb. 18, 1976.

Kathryn Collard, Salt Lake City, Utah, for appellants; John D. O'Connell, Salt Lake City, Utah, attorney of record.

Robert W. Barker, Washington, D. C., attorney of record, for appellee Western Shoshone Identifiable Group; Wilkinson, Cragun & Barker, Donald C. Gormley and Steven C. Lambert, Washington, D. C., of counsel.

Dean K. Dunsmore, Washington, D. C., with whom was Acting Asst. Atty. Gen. Walter Kiechel, Jr., Washington, D. C., for appellee The United States.

Before DAVIS, SKELTON and KUNZIG, Judges.

DAVIS, Judge:

In August 1951 the Shoshones timely filed a petition with the Indian Claims Commission setting forth, among other claims, a cause of action on behalf of the Western Bands of the Shoshone Nations (represented by plaintiff-appellee Temoak Bands of Western Shoshone Indians) for the taking without compensation of large acreage in Nevada and California, including lands covered by the Treaty with Western Bands of Shoshone Indians (Treaty of Ruby Valley), Oct. 1, 1863, 18 Stat. 689 (1875). The United States denied this alleged taking. In 1957 the Indians' title to this land was tried before the Commission and in 1962 the Commission decided that the claimants held aboriginal title to 24,396,403 acres—22,211,-753 in Nevada and 2,184,650 in California. 11 Ind.Cl.Comm. 387, 413–14; see 29 Ind.Cl. Comm. 5, 6. For the California property this aboriginal title was found to have been extinguished in March 1853. With respect to the Nevada portion, the Commission determined that the land was continuously used and occupied "until by gradual encroachment by whites, settlers and others, and the acquisition, disposition or taking of their lands by the United States for its own use and benefit, or the use and benefit of its citizens, the way of life of· these Indians was disrupted and they were deprived of their lands. For these reasons the Commission may not now definitely set the date of acquisition of these lands by the United States." 11 Ind.Cl.Comm. at 415–16.

In 1966 the plaintiff-appellee and the defendant-appellee stipulated that the valuation date of the Nevada portion would be July 1, 1872, and on that basis the parties tried, in 1967, the fair market value of this area. In October 1972 the Commission decided the valuation issues, awarding the claimant $21,550,000 as value on the respective valuation dates and an additional $4,604,600 for minerals removed from the Nevada tract before the valuation date. 29 Ind.Cl.Comm. 5, 7, 57–58. The Government filed a motion for rehearing which was denied in 1973. 29 Ind.Cl.Comm. 472. In that same year the Government filed its set-offs against the award; these issues were tried and submitted to the Commission by March 5, 1974.

It was at this stage of the proceedings that, on April 18, 1974, appellants Western Shoshone Legal Defense and Education Association and Frank Temoke, as part of the Western Shoshone Identifiable Group, filed their petition to stay proceedings and for leave to present an amended claim. The gist of this petition was that the Western Shoshone still have title to approximately twelve million acres of Nevada land to which the Commission had held Indian title to have been extinguished and for which it had made a large award (subject to offsets).[1] Appellants fear that this award, if paid, will bar any future attempt to litigate elsewhere the present title to these lands. *See* 25 U.S.C. § 70u.[2] Acknowledging that Section 10 of the Claims Commission Act, 25 U.S.C. § 70i, gives a tribal organization recognized by the Secretary of the Interior "the exclusive privilege of representing such Indians, unless fraud, collu-

sion, or laches on the part of such organization be shown to the satisfaction of the Commission," the appellants claimed "collusion" between the appellee Temoak Bands and the Government to treat the title to the lands as extinguished rather than as still held by the Indians.

When the United States and the Western Shoshone Identifiable Group, as represented by the appellee Temoak Bands, both opposed this petition, the Commission had oral argument, principally on the question of collusion, and on February 20, 1975, issued its opinion and order dismissing the petition. 35 Ind.Cl.Comm. 457. Appellants then filed a timely notice of appeal which triggered a motion by the Western Shoshone Identifiable Group to dismiss the appeal.

We held oral argument on the motion to dismiss but at that time directed the parties to file briefs on the appeal itself.[3] Now we deny the motion to dismiss but affirm the Commission's decision rejecting appellants' petition.

### I.

Section 20(b) of the Indian Claims Commission Act, 25 U.S.C. § 70s(b), provides for an appeal to this court from any "final determination" of the Commission. We have already ruled that this provision is not limited to those determinations deciding the merits of an Indian entity's claim but embraces all types of holdings made by the Commission, provided always that the requisite finality is present. *Red Lake & Pembina Bands v. Turtle Mountain Band of Chippewa Indians,* 355 F.2d 936, 939–40, 173 Ct.Cl. 928, 934–35 (1965). "The Act no-

1. Appellants' theory, in brief, is that the Western Shoshones had recognized title to the lands which was never taken in largest part, and that, even if the ownership was merely aboriginal title, that title could only be ended for the purposes specified in the Treaty of Ruby Valley *supra*—and title to most of the lands has never been extinguished on those grounds.

2. Section 22 of the Indian Claims Commission Act which provides that (1) payment of any claim, after a determination under the Act, shall be a full discharge of the United States of all claims and demands touching any of the

matters involved in the controversy, and (2) a final determination against a claimant made and reported in accordance with the Act shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy.

3. The Government did not join in the motion to dismiss the appeal or take any position thereon but it has participated in the consideration of the appeal in support of the Commission's determination.

where suggests that certain areas of Commission decision are to be left without appellate review and guidance; * * *. Nor does the legislative history intimate that this court's power to review should cover fewer subjects than the Commission's power to decide." *Ibid. See also Cherokee Nation v. United States,* 355 F.2d 945, 947–49, 174 Ct.Cl. 131, 135–39 (1966). In particular we have held that an order definitely denying intervention, on the ground that the intervenor had no right, is sufficiently conclusive for appeal. *Prairie Band of Potawatomi Indians v. United States,* 165 F.Supp. 139, 141–42, 143 Ct.Cl. 131, 133–35 (1958), *cert. denied,* 359 U.S. 908, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959).

■ Though it was not formally labeled a motion for intervention, the appellants' petition to the tribunal below was equivalent to such an application.[4] It sought leave to present an amended claim on behalf of the Western Shoshone Identifiable Group and to argue in support of that position. The Commission treated the petition in the same way it would deal with an intervention motion. It considered whether appellants had a right to participate in this proceeding and, after deciding that they had not, dismissed the petition finally. On that subject nothing was left for further consideration by the Commission; appellants were definitively refused permission to enter the case and the proceedings were left to continue between the original plaintiff and the Government. Insofar as the Commission was concerned, appellants' connection with the litigation was ended; and that determination of closure was both severed and severable from the final determination of the award to be made to the Western Shoshone Identifiable Group. *Cf. United States v. Fort Sill Apache Tribe,* 507 F.2d 861, 863, 864, 205 Ct.Cl. 805, 807–808, 809 (1974).

Accordingly, we hold that this court has jurisdiction of the appeal and that the appellants have the right to seek review here. The motion to dismiss the appeal is denied and we proceed to the merits of the appeal.[5]

## II.

In passing on the correctness of the Commission's rejection of appellants' petition, we are impressed by two intertwined and striking sets of facts. The first is that that document was first thrust upon the Commission and the parties in 1974, some 23 years after this Western Shoshone claim was first made to the Commission in 1951, some 12 years after the Commission had decided (in 1962) that the United States had extinguished the claimant's title to the large areas involved, eight years after the Commission had approved (in 1966) the parties' stipulation as to the valuation date of these lands, about one and one-half years after the Commission had determined (in October 1972) the actual value of the property, and about a month after the problem of offsets had been tried and submitted for disposition. Thus, the appellants did not seek to put their view before the Commission until after the trial and decision on liability, a separate trial and decision on valuation, and another separate hearing on offsets. On this Nevada-land phase of the Western Shoshone claims there was very little left to do; much time had passed, and much had been done.

The second noteworthy fact is that there is no doubt whatever that appellants were for a very long time quite aware of the position with respect to this Nevada land taken before the Commission by appellee Temoak Bands and its counsel. Appellants' petition presented to the Commission on April 18, 1974, said (p. 4): "Petitioners,

---

**4.** In oral argument before the Commission counsel for appellants said (Transcript of Nov. 14, 1974, at 54): "We are trying to intervene. We would like to just reopen that particular question."

**5.** A separate oral argument was not had on the appeal itself but the parties were expressly given an opportunity to argue the merits during

the argument on the motion to dismiss. Appellants did not avail themselves of that opportunity (though the merits were touched on in the Indian appellee's motion to dismiss), but the appeal has since been thoroughly briefed and the court does not deem further oral presentation to be required.

individual members of the Petitioner Association [appellant Western Shoshone Legal Defense and Education Association], and their predecessors on numerous occasions *over the past thirty-nine years* have resisted any legal action jeopardizing the rights and interests of the Western Shoshone Indians in their tribal lands and have made repeated protests, against the inclusion of such lands in the Claim filed in the above captioned proceeding to the officers of the Temoak Bands of Western Shoshone Indians, the Claims attorneys retained by said organization (see copy of letter from Robert W. Barker attached hereto as Exhibit A) and to representatives of The United States of America" (emphasis added). One of the incidents specifically mentioned occurred in October 1965. In this court in their response to the motion to dismiss the appeal appellants observe (pp. 1–2): "The underlying dispute, which has culminated in this appeal, in reality is, and has for many years, been between appellants (and their predecessors) and the Counsel of Record for · the Identifiable Group (and his predecessors). The appellants have consistently resisted the inclusion within the Claim, filed in the Indian Claims Commission on behalf of the entire Identifiable Group, lands to which they still assert unextinguished aboriginal title and treaty title for the simple reason that their right to assert title to such lands will be forever barred by operation of 25 U.S.C. 70u" (*see* note 2 supra).[6]

It is in the light of these cardinal facts— (1) that appellants *waited so many years* to move before the Commission (2) although fully aware of, and opposed to, what was

occurring in those proceedings, and (3) without giving any adequate excuse for the long delay—that we must assess their right to come in and participate at the current stage.

As we have already noted, appellants concede that Congress has addressed itself to that question in the Indian Claims Commission Act. Section 10, 25 U.S.C. § 70i, gives the exclusive privilege of pursuing the claim to a recognized tribal organization "unless fraud, collusion, or laches on the part of such organization be shown to the satisfaction of the Commission."[7] The Commission found in its findings and opinion of 1962 that the Temoak Bands of Western Shoshone Indians, Nevada, was organized under the Indian Reorganization Act of 1934, 48 Stat. 984, and was recognized by the Secretary of the Interior as having authority to maintain a suit. 11 Ind.Cl.Comm. 387, 388. The interlocutory order entered at that time ruled expressly that the Temoak Bands of Western Shoshone Indians, Nevada, has the right to maintain this action for and on behalf of the aboriginal Western Shoshone Identifiable Group, the land-using entity. Section 10 is therefore operative *prima facie,* and appellants must show "fraud, collusion, or laches" (or some comparable justification) in order to displace the Temoak Bands from their role of exclusive representation.[8]

The exception for "fraud" (as separate from "collusion") can be disposed of summarily. Before the Commission appellants did not claim that the Temoak Bands or their counsel had defrauded the other

**6.** This statement is repeated in appellants' brief on appeal at page 4. That brief also says (pp. 13–14): "Repeatedly over the years, at these 'General Councils' [the Councils referred to were held in 1947 and 1959] and elsewhere appellants and other members of the Identifiable Group expressed the concern of the people that pursuing the Claim before the Commission would forfeit their claim of recognized title to the vacant lands within the Treaty boundaries."

**7.** As it appears in the United States Code, Section 10 reads as follows:

"Any claim within the provisions of this chapter may be presented to the Commission

by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all its members; but wherever any tribal organization exists, recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group, such organization shall be accorded the exclusive privilege of representing such Indians, unless fraud, collusion, or laches on the part of such organization be shown to the satisfaction of the Commission."

**8.** Appellants do not claim laches on the part of the exclusive representative.

members of the Western Shoshone Identifiable Group nor did the various proffers of proof made by appellants suggest such fraud. In this court appellants have expanded their argument to include strong intimations that the counsel for the Indian appellees deliberately misled the Indians as to the nature and scope of the Commission proceedings.[9] But these general allegations are not supported by anything—neither affidavits nor documentation—and they are opposed by affidavits supplied to this court by the Indian appellees. In the absence of some supporting information or detail warranting further inquiries, these belated and unsupported charges of fraud are insufficient to call for a trial or evidentiary hearing. To open up the proceedings, at this late date, on the ground that the bulk of the Identifiable Group has been defrauded requires more than the mere allegations set forth in the briefs in this court.[10] There is no problem of the concealment of the alleged fraud; the asserted "misrepresentations" have long been known to appellants.

■ As for collusion,[11] the Commission found, on the basis of the undisputed record and the appellants' own proffers, that there was no collusion in the conventional sense of that term. We accept and agree with that finding. There was no underhanded agreement, explicit or tacit, between the Temoak Bands and the Government for the former to give up a position more advantageous to the Western Shoshone Identifiable Group or to adopt one more favorable to the Government. What there was in actual fact was a deliberate but unilateral choice in the original petition before the Commission to claim compensation for the "taking" of a very large portion of Nevada land. The Government denied that the Indians ever owned this land or that it owed them any money for the land under the Claims Commission Act. After a trial contested on these grounds, the Commission held that the Western Shoshones held aboriginal title to the territory involved here and that this title was extinguished by a process of gradual encroachment by whites and settlers. Appellants insist that the subject of title-extinction was never tried, going simply by the concurrent agreement of the parties. But evidence on that issue was contained in the materials presented at the 1957 trial and the Indian appellees asked generally for findings that the Shoshone lands had been taken; the Government consistently maintained that the Indians never owned the lands they claimed and therefore that the question of title-extinction never arose. The Commission made its own determination that the Shoshone lands were held by separate Shoshone entities and that Indian title to the area in question was extinguished by encroachment.

■ The parties, instead of having a further trial on the valuation date or dates, then agreed to stipulate that the Nevada lands should be valued as of July 1, 1872, and the Commission accepted this agreement as an implementation of its prior finding of extinguishment. This stipulation was not collusion but a proper application of the admonition that parties to such litigation should attempt to agree, if possible, upon one or a few valuation dates rather than undertake a burdensome individual computation of value as of the date of disposal of each separate tract. See *Creek Nations v. United States,* 302 U.S. 620, 622, 58 S.Ct. 384, 82 L.Ed. 482, 484 (1938); *United States v. Northern Paiute Nation,* 490 F.2d 954, 957, 203 Ct.Cl. 468, 473 (1974);

---

**9.** We could refuse to consider these new charges of fraud since appellants failed to present them to the Commission below. *Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 940, 945, 203 Ct.Cl. 426, 435–36, 443–44 (1974).

**10.** Plaintiff appellee correctly points out that further delay in the termination of this proceeding may very likely cost the Western Shoshone Identifiable Group a very substantial sum of money since interest does not accrue on an award for the taking of Indian title until the amount is paid. *See United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951).

**11.** Before the Commission appellants agreed that they would have to show "collusion," properly interpreted, in order to be allowed to participate in this proceeding.

*United States v. Pueblo of San Ildefonso,* 513 F.2d 1383, 1391, 206 Ct.Cl. 649, 664 (1975). Appellants gave the Commission and gave us no adequate reason to think that the choice of this particular date was unreasonable or an abandonment of the Indians' true interests.

This determination of no collusion is inevitable under the record of this case. Appellants' proffers to the Commission add nothing which is pertinent, and even if accepted at face value do not call for any change in the conclusion.[12] The same is true of the enlarged allegations of collusion made to this court, insofar as they should be considered; we have already pointed out that we need not take account of the newly and belatedly interjected charges of fraud on the Indians by counsel for plaintiff-appellee and by officials of the Bureau of Indian Affairs, allegations which are wholly unsupported.

Appellants attempt to avoid this result by arguing that "collusion," in Section 10 of the Claims Commission Act, is not restricted to its normal meaning of an underhanded, non-adversary agreement in derogation of the rights of the Indians but embraces also the presentation of any contention, even without bad faith or improper conduct, by the exclusive representative which happens not to accord with the view of other members of the identifiable group as to the entity's best interests. In this instance, appellants say that there was collusion, as a matter of law, because the exclusive representative urged that the Indians' title had been extinguished—and therefore compensation was due—rather than arguing that the Indians still owned the land under the Treaty of Ruby Valley—and therefore that there was no claim under the Indian Claims Commission Act.

There are two main answers to this point. The first is that there is nothing to indicate that Congress used "collusion" in that expanded and strained sense, far different from its ordinary connotation. Unless there are good grounds for thinking that the legislature meant an ordinary word to have a special meaning, it is the path of wisdom to follow the normal, common understanding. *Malat v. Riddell,* 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492, 498 (1962); *Selman v. United States,* 498 F.2d 1354, 1356, 204 Ct.Cl. 675, 680 (1974).

Secondly, appellants' unique understanding of "collusion" would undercut the position of the exclusive representative to which Congress assigned the chief management of the litigation. If "collusion" automatically exists every time a segment of the Indian entity disagrees with the litigating position taken by the exclusive representative, then there is little left to the "exclusive privilege of representing such Indians" granted by the statute to a recognized tribal organization. Congress could not have meant to leave the status of the exclusive representative so vulnerable to attack by any part of the represented group, no matter how minor or uninformed or how often voted down in the internal proceedings of the recognized entity.

But, say appellants, their position is not that of a minority but of the majority of the Western Shoshone Identifiable Group and that majority has had no way of causing the recognized organization, the Temoak Bands, to see the light. In the Commission below, however, appellants did not assert that a majority of the Identifiable Group was opposed to the Temoak Bands' position in 1951 (filing of the claim)

---

12. The proffers before the Commission simply spelled out appellants' legal theory that the Nevada lands still belonged to the Western Shoshone Identifiable Group, asserted that appellants had protested the conduct by plaintiff-appellee of the litigation, asserted generally that the stipulation as to date of taking was prejudicial, said generally that the "Western Shoshone people, through their traditional leaders [*i. e.* appellants] and by their own individual actions have continued to assert their common ownership," and alleged that the vast majority of the members of the Identifiable Group "now" desire to have the issue of the current validity of their title determined before an award is paid under the Claims Commission Act.

or 1957 (hearing on title) or 1962 (determination of title extinction) or 1966 (stipulation as to date of valuation) or 1967 (trial on valuation) or 1972 (determination of valuation)—the dates of the crucial steps in this proceeding. The only proffer was that the "vast majority of the people comprising the Western Shoshone Identifiable Group *now* desire to have the issue of the validity of their title" (emphasis added) to the Nevada lands determined before the close of Commission proceedings, and even then there was no support for this allegation as to the balance of views in 1974. In this court appellants have apparently widened their proffers to say that a majority was at all times against the position of appellee Temoak Bands.[13] But again there is no supporting detail, no affidavit, no attempt to make a prima facie showing that the allegation is true or at least worthy of an extended inquiry.

We hark back to the long lapse of time before the appellants filed their petition in 1974, and the prejudice to the other parties which occurred because appellants (and those they say they represent) allowed years to go by before they sought to insert their viewpoint into these proceedings. In view of this long and prejudicial delay, it is fair to insist that appellants buttress their allegations by more than self-serving generalities if they are to be accorded a trial.[14]

The law furnishes helpful analogies for the proposition that the longer the delay, while pertinent litigation has been going on, the more impressive a showing the latecomer must make to be able to participate in the proceedings or to initiate a new problem. For instance, the longer the delay the easier it is to find laches (where laches applies). *Gersten v. United States,* 364 F.2d 850, 852, 176 Ct.Cl. 633, 636 (1966). Intervention under Rule 24 of the Federal Rules of Civil Procedure, the intervention rule, is denied where delay is undue and the rights of the original parties may well be prejudiced. *See, e. g., Gerstle v. Continental Airlines, Inc.,* 466 F.2d 1374, 1377–78 (C.A.10, 1972); *MacQueen v. Lambert,* 348 F.Supp. 1334, 1335–36 (M.D.Fla.1972). Also, the law is developing a critical eye toward persons who, knowing that a pending action is designed to stabilize legal relationships that concern them, deliberately stay out of that litigation although they could easily enter it. *Cf. Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 114, 88 S.Ct. 733, 740, 19 L.Ed.2d 936, 947 (1968); *Aerojet-General Corp. v. Askew,* 511 F.2d 710, 718–20 (C.A.5), *cert. denied,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975); *Gambocz v. Yelencsics,* 468 F.2d 837 (C.A.3, 1972). Specifically in Indian Claims Commission Act litigation, this court has held that Tribe W could not intervene in a suit brought by Tribe K, some twenty years after the action was first brought, where the intervention, if allowed, could lead to the defeat of K's claim. "It would work an injustice to allow them to join in a timely filed suit by the Appellees when the result of that intervention may be the defeat of the Appellees claim, and of any claim." *United States v. Kiowa, Comanche & Apache Tribes,* 479 F.2d 1369, 1377–78, 202 Ct.Cl. 29, 44–45 (1973), *cert. denied sub nom., Wichita Indian Tribe v. United States,* 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974). We have also rejected as barred by laches (as well as on other grounds) an independent action, delayed eight years, to set aside a settle-

13. Appellants' brief on appeal says (p. 15); "During the entire proceeding before the Indian Claims Commission, counsel for the Identifiable Group and counsel for the United States failed to inform the Commission that a majority of the members of the Identifiable Group asserts unextinguished aboriginal and recognized title to the lands within the boundaries of the *Treaty of Ruby Valley.*"

14. Section 8(b) of the Commission's General Rules of Procedure calls upon a petitioner chal-

lenging the failure of the exclusive representative to take certain action to "set forth *with particularity* the efforts of the petitioner to secure from the duly constituted and recognized officers of said tribal organization such action as he desires and the reasons for his failure to obtain such action (such as fraud, collusion or laches) or the reasons for not making such effort" (emphasis added). The degree of particularity may well depend on the lateness of the application.

ment judgment of the Commission. "No adequate excuse for eight years of inaction is offered. If they are lawfully in court now, they could have been here then." *Andrade v. United States*, 485 F.2d 660, 664, 202 Ct.Cl. 988, 996–97 (1973), *cert. denied sub nom., Pitt River Tribe v. United States*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974).

This general principle that the later a person seeks to enter and disrupt an ongoing litigation the more of a showing he must make impels us, as it did the Commission, to reject appellants' petition. The hour is very late and the showing is not strong. The fact is that at bottom all that appellants have demonstrated is that there is a dispute between an undetermined number of supporters of appellants and the organized entity, the Temoak Bands, over the proper strategy to follow in this litigation. The Indian appellees believe it best for all the Western Shoshone Identifiable Group to contend that the Nevada lands involved were "taken" by the United States and that therefore very large amounts of money are due the Identifiable Group for that extinguishment of title. Appellants, on the other hand, believe that the correct course to pursue is to insist that the lands were never taken and are still owned by the Identifiable Group (and putatively more valuable today than in 1872). Both positions entail risk. The Indian appellees run the risk of giving up a claim to continued ownership which, if vindicated, could prove to be

worth much more and be more satisfying than an award under the Claims Commission Act. Appellants' risk is the opposite: If they should prove wrong in their claim to continued title they would be too late (absent special congressional action) to seek monetary compensation for the "taking" and would have given up, for nothing, a claim to a very large sum. Certainly the arguments in favor of appellants' position are not overwhelming or clear as day.[15] At the best from their viewpoint the question is an open one which could be decided either way. This is precisely the kind of litigation strategy the statute leaves to the organized representative—unless perhaps there is timely and immediate intercession by the dissenting group before the proceedings have progressed so far that all parties can properly rely on the litigation position assumed by the organized entity which is the "exclusive" representative.[16]

Plaintiffs make some feints against the constitutionality of Section 10's reposing the privilege of exclusive representation in the organized entity (subject to the exceptions for fraud, collusion or laches). But it makes sense for Congress to have taken that position. A claim under the Claims Commission Act is not an aggregation of individual claims but a group claim on behalf of a tribe, band or other identifiable group. *Fort Sill Apache Tribe v. United States*, 477 F.2d 1360, 1362, 201 Ct.Cl. 630, 634–35 (1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772 (1974); *Absentee*

15. Appellants have sketched their substantive arguments for us in some detail (in the form of a copy of the brief submitted to another forum on those questions). The commission, below, without passing on the issues, indicated its great doubt as to the correctness of appellants' position on the merits. 35 Ind.Cl.Comm. 457, 471–76.

16. Appellants' fear, as we have noted, is that payment of the judgment will, under Section 22 of the Claims Commission Act, 25 U.S.C. § 70u, bar the Identifiable Group from thereafter claiming the land as still its own. They say they seek a final determination of this issue of continued ownership before an award is made, and contend that a pending suit in the District Court for Nevada furnishes that opportunity. The Commission refused to stay its proceed-

ings pending resolution of the Nevada action. We think this was a permissible choice on the Commission's part. Postponement of the conclusion of the present proceeding will harm the Indians monetarily if their claim to continued ownership fails. *See* note 10 *supra*. It may also be noted that the bar of Section 22 does not fall until payment (*see* note 2 *supra*). If the majority of the Identifiable Group wishes to postpone payment, in order to try out the issue of current title, it can, of course, ask Congress to delay making the appropriation and direction which will be necessary to pay the award. *Cf. Turtle Mountain Band of Chippewa Indians v. United States*, 490 F.2d 935, 951–53, 203 Ct.Cl. 426, 454–56 (1974). That course is still open if the majority of the Identifiable Group can be persuaded to follow it.

*Shawnee Tribe v. United States,* 165 Ct.Cl. 510, 514 (1964); *Cherokee Freedmen v. United States,* 161 Ct.Cl. 787, 788 (1963). The suing claimant represents that group interest, and it is reasonable to say that at least *prima facie* the organized entity "recognized by the Secretary of the Interior as having authority to represent such [claiming] tribe, band, or group" should be the exclusive suing party. An Indian claim under the Act is unlike a class suit in that there is no necessity that the position of each individual member of the group be represented; it is only the group claim which need be put forward. If there are circumstances in which the organized entity fails properly to represent the group, the normal method of redress is through the internal mechanism of the organized entity. And if there be cases in which the internal mechanism is clogged or unavailable [17] then, at the least, the members claiming to represent the majority interest are required to make their position formally known to the Commission and the other parties as soon as possible—and not after much work has been done, and years have passed, on the unchallenged assumption that the organized entity represents the group. To intercede at so late a date requires, at the least, a compelling showing of the kind not made or even attempted here.[18]

Finally, we reject, as we have already suggested, appellants' contention that they are entitled to a trial or evidentiary hearing simply because they have raised questions as to whether the Temoak Bands properly

represent the Western Shoshone Identifiable Group. Nothing in the Act or the Commission's Rules gives them such an automatic right,[19] and the Commission did not abuse its discretion in holding that the belated petition for intercession did not contain enough of a detailed factual predicate to call for such a hearing. As we have said, the proffers before the Commission could all be accepted *arguendo,* without necessitating a trial or evidentiary hearing, since they were irrelevant to the issues properly posed under Section 10. The additional proffers advanced in this court are inadequate, both because they were not presented to the Commission below and also because, in any event, they are too unsupported and too general to warrant a trial (or evidentiary hearing) this late in the proceedings and after so long a lag in the initial presentation of appellants' position to the Commission. Appellants tell us that they think they can make their case through the discovery mechanism but, at this point in the proceedings, it is far too late to hope that proof will be obtained through discovery; to upset the applecart after the fruit has been so carefully collected and piled, appellants would have to possess already, and to present, some hard proof justifying the disruption and turn-about-in-position they seek to require.

The Commission did not err in rejecting appellants' petition to present an amended claim and for a stay of the proceedings.

*Affirmed.*

---

**17.** Although claiming to be members of the Western Shoshone Identifiable Group, appellants say that they do not belong to the Temoak Bands and may also be suggesting that they are not eligible to join.

**18.** In *Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 953–54, 203 Ct.Cl. 426, 456–59 (1974), we upheld the Commission's allowing the Little Shell Band to participate in the proceeding as an "identifiable group" along with the Turtle Mountain Band and the Pembina Band. But the Little Shells had participated from the beginning and did not seek to enter in circumstances comparable to the late and conflictual situation present here. The flat statement, in connection with the court's discussion of that question, that

"[t]he exclusive right granted [by section 10] to such an organization extends only to the representation of its own members" (490 F.2d at 954, 203 Ct.Cl. at 459) was overly broad and is not fully applicable to a case like this in which one organized entity *prima facie* represents the whole ancestral group over many years.

**19.** Section 17 of the Claims Commission Act, 25 U.S.C. § 70p, calls for "evidence" on the substantive determination of a claim, but does not preclude the Commission from deciding issues such as intervention or participation on the basis of argument and proffers of fact. Similarly, the Commission's Rule 30 requires a trial on such issues only when ordered by the Commission.