**The TEMOAK BAND OF WESTERN SHOSHONE INDIANS, NEVADA, Appellant,**

v.

**The UNITED STATES and the Western Shoshone Identifiable Group Represented by the Temoak Bands of Western Indians, Nevada, Appellees.**

**Appeal No. 1–78.**

United States Court of Claims.

Feb. 21, 1979.

Reid Peyton Chambers, Washington, D. C., for appellant. Sonosky, Chambers & Sachse and Marvin J. Sonosky, Washington, D. C., of counsel.

Dean K. Dunsmore, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for appellee U. S.

Robert W. Barker, Washington, D. C., for appellee Western Shoshone Identifiable Group, etc. Wilkinson, Cragun & Barker, Jerry C. Straus and John M. Facciola, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and NICHOLS and BENNETT, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

NICHOLS, Judge:

Both sides appeal from a judgment of the Indian Claims Commission relating to the claim of the Western Shoshones for taking of aboriginal title lands in the present States of California and Nevada. The claimants long prosecuted the claim on the basis that the entire tract was taken on a date to be determined, and because of this the claim of the Indians was money com-

pensation only. In 1974 a group of Shoshones attempted to intervene, asserting that the claimants still own much of the tract. They wanted a stay or suspension to allow their position to be developed and presented. *See Western Shoshone v. United States*, 531 F.2d 495, 209 Ct.Cl. 43, *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). Now new counsel representing the tribe itself, or purporting to do so, make a like contention. Defendant as appellee opposed below and opposes here any such suspension. We hold that far too much water had gone under the bridge even in 1974; we think the Commission effectuated the will of Congress more perfectly by allowing this case to come to final judgment, and we therefore affirm on appeal its decision not to suspend. In defendant's cross-appeal, its contention, which we reject, is that the Commission erred in awarding $4,604,600 as compensation for minerals removed from the tract before the stipulated valuation date of July 1, 1872. The former counsel for the Indians, not the new ones, argued for them this portion of the case. Our analyses of these issues follow, part I discussing the Indians' appeal, and part II the government's appeal.

# I

The desire of the Indians to make the water flow back under the bridge is explained as a natural reaction to a visible change in legal climate, where Indian claims to own large tracts are reported in litigation or settled favorably to them, whereas, they say, in 1946 the pursuit of a money award, as made possible by the Indian Claims Commission Act, 25 U.S.C. § 70a and ff, seemed the only hope for justice. The instant claim is one of many where the Commission was unable to discover any formal extinguishment of Indians' legal title, only gradual encroachment by settlers and others, and takings, the exact date of which could not be definitely set. 11 Ind.Cl. Comm. at 416. The Indians now claim, as not taken, only vacant land, not settled, patented, improved or mined, and no town sites. In *United States v. Northern Paiute Nation*, 393 F.2d 786, 807, 183 Ct.Cl. 321,

358 (1968), it was suggested by one judge of those participating that as to vacant, unimproved land in the public domain, in Nevada, where Indian title was not formally extinguished, it had not "been taken yet" (*i. e.*, by 1968). There might be a considerable difference between an award for desert land "taken" over a century ago, but not carrying interest, and the selling price of even such desert land today, and counsel say the Indians would be able to use much of the involved land in their present way of life. Much of it is grazing land.

The proceeding was started in 1951. By stipulation filed February 11, 1966, the parties agreed that the "valuation date" for Shoshone Nevada land would be July 1, 1872. Findings as to the extent of the land taken, 22,211,753 acres in Nevada, and 2,184,650 acres in California, had already been made. A trial on valuation took place in September 1967, and following oral argument and briefing, the Commission awarded plaintiffs $21,350,000 for the Nevada land, to which it added $200,000 for California land, and $4,604,600 for removal of minerals from the Nevada land before the taking date. It deducted $9,410.11 as payment on the claim, and nothing for offsets, making a total judgment of $26,145,189.89, as entered. 40 Ind.Cl.Comm. 318, 452 (August 15, 1977).

The attempted intervention was by the Western Shoshone Legal Defense and Education Association and Frank Temoke. It was filed with the Indian Claims Commission April 18, 1974, at which time the extent and value of land and minerals taken had been determined, and only the offsets and payments then awaited adjudication. The intervenors alleged the Western Shoshones still had title to about 12 million acres, and they claimed collusion between the Temoak Bands and the government to treat the title as extinguished. The Commission, after hearing oral argument, dismissed the intervening petition. 35 Ind.Cl.Comm. 457. This court affirmed in the decision cited above. After holding the intervenor's appeal was not premature and that we therefore had jurisdiction of it, we pointed out

how belated the attempted intervention was in light of how much the Commission had done and how little remained to do; that the intervening petitioners themselves alleged they had been aware of the case for 39 years and had repeatedly protested; and that no adequate excuse was offered for the long delay. We said that the longer the delay, the better the reason for intervention that had to be shown. We held that the intervenors could not take control of the case from those then in charge unless they could show fraud, collusion, or laches, none of which was alleged except in conclusory assertions not sufficient to call for a trial. Instead of collusion, there was, we thought, a deliberate unilateral choice to claim compensation as for a "taking" of the involved lands. As regards the fear of the intervenors that they might lose the right to claim title if the case proceeded to final judgment, we pointed out that by Section 22 of the Act, 25 U.S.C. § 70u, the United States would not be discharged of any claim, including one that the Western Shoshones owned the land, until the judgment was reported to Congress, money to pay it appropriated, and payment made. The intervenors might, we said, ask Congress to delay payment.

The Temoak Band had been determined to be entitled to control the litigation on behalf of all Western Shoshone, and the intervenors were deemed by us to be non-Temoaks. Now, however, the Temoak Band itself has ostensibly changed its position. Following our remand, it petitioned the Secretary of the Interior to determine that the Western Shoshone retained ownership of the claimed acres, terminated the contract with Wilkinson, Cragun & Barker (hereinafter called old counsel), who had been in charge of this litigation hitherto, and retained Sonosky, Chambers & Sachse (hereinafter called new counsel). Old counsel have continued to participate so far as concerns the government cross-appeal. A brief by them is on file in which they also contest the legality of their purported ouster, and say the Indians have not had a chance to vote on it, but by consent of all counsel, this issue was not argued orally.

To decide it does not appear necessary for adjudication of the appeals now before us. New counsel moved for a stay of proceedings in the Indian Claims Commission, and the Commission denied the motion the same day it entered its final judgment, August 15, 1977. New counsel appealed the denial order and the judgment on November 11, 1977. It is said the Secretary is awaiting our decision on this appeal before making any move to adjudicate the title claim, but neither we nor the Commission have stayed or, it would appear, have had authority to stay, any adjudication he might engage in as to the title.

We can and do assume that the Temoaks really desire to sweep the water back under the bridge, and that they have employed new counsel to assist them in this endeavor. Any question as to the rights of new and old counsel vis-a-vis one another can wait until the proper time for adjudicating such matters. We can also put aside as irrelevant whether the course now proposed will or will not be more beneficial to the Shoshone, Temoak and others, than the one previously charted.

A different question would arise if the Temoaks desired to abandon this proceeding in its entirety. They do not. They make no claim to the title at present to ten million acres, more or less, which they still concede were taken, and eventually, their compensation to be awarded for that must come to judgment here, if the present one does not stand. Presumably, as to that as well as to the lands they do claim, if they work their will, the proceeding here must simply wait. After they have carved out whatever part they successfully claim to own, the award for the rest must be redetermined. That could be a simple matter if the parties were willing to use the record already made and the findings of the Commission. That matter does not rest in the discretion of the Temoaks alone. They cannot change their litigation position so drastically and not allow their adversary a like privilege. Defendant, also, now repents many of the stances it has taken in the conduct of this litigation. Most likely it

would not now agree to the valuation date it once stipulated. With a different valuation date, the expert appraisals would be out of court and new ones would be necessary. This lawsuit has already lasted since 1951, for reasons peculiar to this type of litigation, which no one criticizes, and it appears the Temoaks contemplate cheerfully another quarter century of litigation. The Commission's position was:

> * * * [W]e are of the opinion that it is too late in the litigation for the Commission to be asked to stay proceedings in order to permit the adjudication of the case on a new theory, and this would be our position had the request come from the attorney of record for the plaintiff [old counsel] since the law of the case has long been established. 40 Ind.Cl.Comm. 305, 308–09.

The parties have embellished this stark proposition with citations as to the law of the case prevailing over the policy of new counsel, etc. We prefer to adopt it as our own without such embellishment, and hereby do. At the very least that can be said for it, it does not reveal an abuse of discretion.

We think that when the defendant announces by statute or regulation a procedure for presenting and deciding claims against it of some particular kind, and when a claimant files a petition in the manner and form prescribed, that is the procedure to be followed. The implied obligation of the claimant is to state his claim and stick to his statement, and to prosecute his claim diligently to adjudication, so that it can be paid and the government relieved of the threat of it as a thunder cloud in the sky. The correlative obligation of the defendant is to accord due process, to make its defense diligently though fairly, and to pay whatever award the required procedure produces. The diligent prosecution of a claim implies the dealing with it on a straight forward basis. The abandonment of an entire claim at any point with prejudice may well be a claimant's right, but the partial and contingent abandonment of it, after 25 years, without prejudice, when the goal of final adjudication is in sight cannot

be. That is in essence what the Indians would do here.

Plaintiff says defendant is not harmed by the proposed partial and contingent abandonment, because the award does not bear interest, but defendant is the best judge of its own welfare and it is here urging us to affirm the Commission. The Temoaks were under a duty to defendant to discover and announce their claim to own the 12 million acres adjudged to have been taken, perhaps not before they filed the petition, but surely before 1976. There can be no doubt that Congress passed the Indian Claims Commission Act, 25 U.S.C. § 70 and ff, with the object of drawing in all claims of ancient wrongs, respecting Indians, and to have them adjudicated once and for all. It may have even been so optimistic as to hope to have this accomplished in the lifetimes of persons then living. It provided in Section 22 that payment of a claim as assessed under the Act would discharge not only the specific claim made, but all claims and demands touching any of the matters involved in the controversy. The object was not pecuniary, in the short-term sense, so the saving or incurring of interest is not the major matter. Congress had long-term political objects, in the non-pejorative sense of the word "political," that are frustrated by continued delay in adjudication of claims.

Moreover, there is a third party to the controversy, whose interests litigants often neglect, the tribunal itself, the Indian Claims Commission at the time of the order appealed from, now ourselves as its successor. As Chief Justice Burger has said:

> We can no longer indulge in the old notion that it is "up to the lawyers to push cases." *Once a case is filed it is public business as well as private.* It is up to judges to see to it that dilatory tactics by neither party can frustrate speedy justice. [Emphasis supplied.] [Press Release by Supreme Court Public Information Office, December 21, 1978.]

We think, if this case had been sidetracked in the manner proposed, it would have been contrary to the statutory proce-

dure under which the suit was brought, the intent and purpose of the Act, and the duty of the federal judicial system to employ its resources economically as well as to achieve the ends of justice speedily. If the Indians desire to avert the extinguishment of their land claims by final payment, they should go to Congress as recommended in *Western Shoshone*, 531 F.2d at 503, n.16, 209 Ct.Cl. at 59, n.16. If Congress wishes to alter or undo the normal course of Indian Claims Commission adjudication, it knows how to do it. *Cf.* Act of March 13, 1978, Pub.L.No. 95–243, 92 Stat. 153. The matter is somewhat changed since the *Western Shoshone* footnote because Congress can no longer stop the payment and defer the extinguishment of the title claim, just by not appropriating. By recent enactments, Act of March 7, 1978, Pub.L.No.95–240, 92 Stat. 107, 116 and Act of May 4, 1977, Pub.L.No. 95–26, 91 Stat. 61, 96, Congress has amended the old standing appropriation to pay Court of Claims judgments, 31 U.S.C. § 724a, to make it available for Indian Claims Commission judgments, and to remove the old $100,000 limitation, there being now no upper limit on the amount of the judgment that can be paid. Thus it looks as if the Temoaks would have to get Congress to act affirmatively. In view of its plenary power over Indian tribal property, as spelled out in *Turtle Mountain Band of Chippewa Indians v. United States*, 490 F.2d 935, 945, 203 Ct.Cl. 426, 444 (1974), we have no doubt that even after payment its action could be effective. And we think it is only Congress that could stay and undo the course of litigation at this late date, and if anybody should, it is only Congress. The essential point of the matter is that the Temoak's true appeal is to legislative grace, not as of right to this court. We do not mean to intimate a view whether or not new legislation should be enacted.

## II

The cross-appeal is against the award by the Indian Claims Commission of $4,604,600 for removal of minerals from the Nevada portion of plaintiff's aboriginal lands before July 1, 1872, the stipulated valuation date. The Commission found it could not definitely set the valuation date, whereupon the parties stipulated that as to the Nevada portion it was July 1, 1872. The Commission awarded $21,550,000 as the fair market value on the valuation date, of which $200,000 was for the California portion and the rest for the Nevada portion, not in contention in this appeal. The $4,604,600 was in addition, and supposedly the minerals removed, being no longer in place on the valuation date, did not constitute part of the then value.

The Commission considered that its decision was controlled by *United States v. Goshute Tribe*, 512 F.2d 1398, 206 Ct.Cl. 401 (1975). As defendant says, that is the only case where this court has sustained an award for removal of minerals before a found taking date. The facts of that case and this are indistinguishable. By almost identical and contemporaneous treaty provisions, there the Goshutes, Treaty of Tuilla Valley, 13 Stat. 681, here the Western Shoshone, Treaty of Ruby Valley, 18 Stat. 689, both in 1863, agreed with the same commissioners that the countries of the respective tribes might be explored and prospected for gold and silver, or other minerals, that mines when discovered might be worked, mining and agricultural settlements formed, and ranches established; that mills might be erected and timber taken for their use, as also for building. In recognition of the inconvenience to be anticipated to the respective tribes, including loss of game, the United States agreed to pay Goshutes $1,000 per annum for twenty years, the Western Shoshone $5,000 per annum in such articles, including cattle, as the President might determine. Defendant does not distinguish the cases by the small differences in the treaty provisions.

In both instances, large amounts of valuable ores were mined and removed between the treaty dates and the found or agreed dates of valuation, or in other words, of full title extinguishment. In *Goshute*, we took the view, as the Commission did, that the tender of such a one-sided treaty for adhesion, in 1863, to ignorant and unlettered

Indians, was unfair and dishonorable, generating a right to recovery under clause 5 of section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a, "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." The Commission found, then and here, that a royalty of 20 percent of the value of the minerals removed up to the taking date, less the consideration paid, would be fair compensation. We agreed then, as we do here, that a valid claim under "fair and honorable dealings" was presented and the mode of rectifying it was proper. In this connection, we may further observe that law and equity, before 1946, did not afford a judicial remedy for the overreaching of an Indian tribe by an unfair treaty such as we have here. *United States v. Choctaw and Chickasaw Nations,* 179 U.S. 494, 21 S.Ct. 149, 45 L.Ed. 291 (1900). It was considered a "political" matter, entirely in the hands of the "political" i. e., the executive and legislative, authorities.

We further took the view that the treaty language did not confer on the United States or the miners any ownership of the minerals in the ground, only a license to remove whatever they did remove. So here also.

The taking award in both cases is founded on clause 4 of section 2, "claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant  *  *  * ." The right to recover a 20 percent royalty under clause 5 is deemed terminated as of the taking date, and instead the minerals remaining in the ground are considered and valued as part of the entire fee. Such is the Commission's theory of both cases approved and adopted by us in our *Goshute* decision. We note that the value of the minerals in the ground on the taking date was found to be $12,500,000, while townsites were $900,000, farming land $1,500,000, good grazing land $3,750,-000, fair to poor grazing land $2,700,000, all for the Nevada portion, making the total award for that portion $21,350,000, as stated above. Thus minerals were the predominant element.

Defendant makes much of the alleged distinction that in *Goshute* the Commission found the taking date, January 1, 1875, whereas here it was a matter of stipulation that the "valuation date" should be July 1, 1872. 29 Ind.Cl.Comm. 5, 7. Defendant says there was no stipulation as to the taking date.

Despite the similarity of the *Goshute* facts, defendant wants to make the controlling precedent here not *Goshute,* but *United States v. Northern Paiute Nation,* 490 F.2d 954, 203 Ct.Cl. 468 (1974). In that case there was no treaty, no "fair and honorable dealing" claim based on an unfair treaty. We held that the Northern Paiutes, having previously been awarded a substantial sum for the value of their aboriginal Nevada lands on an average or composite taking date, December 31, 1862, could not also recover "trespass damages" for failure of the United States to protect the tribal lands from ravages by miners before that date. The explanation was in part a serious doubt whether the United States was not being compelled to pay for the same thing twice. In the earlier case, 393 F.2d 786, 183 Ct.Cl. 321 (1968), the damage done by the miners before the taking date, and the value added by their improvements, had both alike been ignored, in a sort of washout. The value assigned to the mineral property on the taking date was based on speculative purchases and sales of mineral property, and there was nothing to show it was abated a single dollar because of prior removal of minerals. On the technical side, we took the view that the United States having ratified and confirmed the miners' acts, they became acts of the United States, and takings. The found taking date having been an average or composite one, nothing having been found to have happened on the chosen date, it was not inconsistent with an earlier taking date for the mining claims actually staked before December 31, 1862. In fact, in stipulating use of that date for valuation, the parties expressly reserved the right to question any order the Commission

might issue concerning taking dates. Thus our view was that the prior proceeding had adjudicated the liability of the United States for all takings, including those by miners which it had ratified and adopted. We left open the possible further liability for "trespass damages" in case of any ravages by miners not so ratified and adopted by the government, but we have not been informed whether that possibility was pursued.

The theory of the second *Northern Paiute* case thus was that against that tribe there was only one wrong, a taking, though one spread out in time, compensable under only one clause of the Act, clause 4, section 2, and that the attempt by the Commission to generate out of it two proceedings and two awards, was error. In *Goshute*, on the contrary, there were two wrongs, the unfair treaty of 1863 and the taking of 1875. They were compensable under two different clauses, 5 and 4, and compensation was assessed separately but simultaneously in one proceeding, a prudent joinder which gave good assurance against double compensation for the same thing. In both cases we rejected the Commission's "trespass damages" theory. The view put forward in *Northern Paiute* of imputing the miners' staking of claims to the United States, making the United States a taker pro tanto, could not apply in *Goshute*. As we then pointed out, the miners entered under the license the Indians had granted in the 1863 treaty, and not adversely to the Indians, and, therefore, their entries effected no takings. Conversely, as we also held, they acquired no title to minerals in the ground, and thus their entries could in no way have anticipated or forestalled the 1875 taking stipulated as the valuation date. That the 1875 date in *Goshute* was just as much a composite, average, or jury verdict date as the one in *Northern Paiute* is obvious, but the point was that the composite could not have included, as one of its elements, takings by miners, imputed to defendant. In *Goshute*, the Indians received royalties for pre-taking removal of minerals by way of reformation of an unfair treaty, but in *Northern Paiute*, no such view of the matter was possible.

The question of supplemental "trespass damages" came up again in *United States v. Fort Sill Apache Tribe*, 533 F.2d 531, 209 Ct.Cl. 433 (1976). In that case there was likewise no previous unfair treaty, so the *Goshute* rationale did not apply. The findings of the Commission were such as to rule out the theory of imputing to the United States takings by miners in staking their claims. We held there was no theoretical obstacle to holding the United States liable, under clause 5, for dishonorable failure to bar trespassers from extracting minerals, but in such a case the United States should receive credit for whatever the trespassers did that enhanced the value of the land before the taking, and thus the taking award itself. The "trespass damages" a divided court held should net the value-destructive and value-enhancing activities of the trespassers' activities in their totality. Fair and honorable dealings required no more.

It will be obvious, we think, that whether a magic date is called a taking date or valuation date, and whether it is found by the Commission or stipulated is irrelevant in deciding whether to follow *Goshute*. What sets *Goshute* apart is that there are two kinds of wrongs, not one, with entirely different impacts on the fortunes of the Indians, and compensable under different clauses of the Act.

As we indicated in *Goshute*, 512 F.2d at 1403, 206 Ct.Cl. at 411, the absence of any allowance of credit to the United States for whatever it or the miners might have done to enhance the taking date value, before the taking, was troublesome. We noted, however, the nonuse in the award of speculative values that the miners might have created, the absence of any contention by defendant that the taking award was enhanced by such causes, and the predominance of actual or estimated quantities of minerals in both the pre-taking and taking portions. We cannot insist on perfect awards. The case would be different if defendant had made offers of proof before the Commission to show that the miners' presence and activi-

ties in the area, or those of others, made possible by the treaty, did enhance the value and affect the amounts awardable for the taking. As things are, we can only guess that such an effect occurred. On the other hand, the Commission might have held that in correcting an unfair treaty it should consider what was known on the treaty date, to make a corrected treaty that fair-minded treaty commissioners and knowledgeable Indians would have thought proper then. It might be thought unlikely that such negotiators would have speculated about future rises in land value and future takings. In this regard, the *Goshute* case, with an unfair treaty to correct, is also distinguishable from *Northern Paiute* and *Fort Sill Apache*, where there was none. The 20 percent royalty, unadjusted, as proposed by the Commission in all three cases, clearly has a better theoretical foundation in the unfair treaty case.

At any rate, though we think *Goshute* was rightly decided, whether right or wrong it is an all-fours precedent here that could be overruled only by the full court en banc. The case cannot be distinguished from *Goshute* in any feature that is relevant.

Accordingly, the plaintiff's appeal is overruled, the defendant's cross-appeal is overruled, and the judgment of the Commission is

*Affirmed.*