SIOUX TRIBE OF INDIANS

v.

UNITED STATES.

No. 74.

United States Claims Court.

Dec. 17, 1987.

Robert T. Coulter, Curtis G. Berkey and Steven M. Tullberg, Washington, D.C., for movants Oglala and Rosebud Sioux Tribes. Mario Gonzalez, Pine Ridge, S.D., of counsel.

Arthur J. Lazarus, Washington, D.C., for plaintiff Sioux Tribe of Indians, opposing the motion. Marvin J. Sonosky and William Howard Payne, Washington, D.C., of counsel.

Edward J. Passarelli, Washington, D.C., with whom was Acting Asst. Atty. Gen. Roger J. Marzulla, for defendant.

## MEMORANDUM ORDER

YOCK, Judge.

Currently pending before this Court is a motion for relief from the judgment en-

tered in this case on July 30, 1987. USCC Rule 60(b). The motion is filed by only two of the eight reservation tribes (Oglala Sioux Tribe and Rosebud Sioux Tribe) that comprise the plaintiff in this case, the Sioux Tribe of Indians. The two reservation tribes assert that the attorney(s) of record in this case had no authority to enter into a stipulation of facts, which, when approved by this Court, formed the basis for the Court to order the final judgment herein.

For the reasons discussed herein, the motion is denied and the judgment as issued will stand.

### Factual Background

This case commenced in 1950 under the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049, 25 U.S.C. § 70 *et seq.* (1976), in the name of the land-owning, treaty-signing Sioux Tribe of Indians. The Sioux Tribe of Indians, the owner of the 1868 Treaty claim, has not existed as an entity since 1890. As permitted by the Indian Claims Commission Act (25 U.S.C. § 70i (1976)), suit was brought in a representative capacity on behalf of the Sioux Tribe of Indians by the eight present-day Sioux reservation tribes.[1] After some 28 years of hotly contested litigation, the Indian Claims Commission ultimately entered an award of $43,949,700 in favor of the Sioux Tribe of Indians, free of all offsets.[2] The Commission found that the Sioux Tribe of Indians had been paid an inadequate amount of money for the land it ceded to the United States under the 1868 Treaty. It also found that the Government could not claim any offsets against this award

---

1. These eight reservation tribes are the Sioux Tribe of the Rosebud Indian Reservation, the Sioux Tribe of the Standing Rock Indian Reservation, the Sioux Tribe of the Pine Ridge Indian Reservation, the Sioux Tribe of the Cheyenne River Indian Reservation, the Sioux Tribe of the Crow Creek Indian Reservation, the Sioux Tribe of the Lower Brule Indian Reservation, the Sioux Tribe of the Santee Indian Reservation, and the Sioux Tribe of the Fort Peck Indian Reservation.

2. Previously, the United States Court of Claims, also on a Government appeal, had upheld the Commission's jurisdiction to hear and decide the Sioux Tribe's claim for loss of land under the Treaty of April 29, 1868, 15 Stat. 635. *Sioux Tribe v. United States,* 205 Ct.Cl. 148, 179–86, 500 F.2d 458, 475–78 (1974).

due to a history of dishonorable dealings. *Sioux Tribe v. United States,* 42 Ind.Cl. Comm. 214, 232, 257 (1978).

The Government did not contest the liability award of some $44 million, but did appeal the decision to the United States Court of Claims solely on the offsets issue. Upon reviewing the case on appeal, the Court of Claims reversed the Commission on the offsets issue, finding that it had failed to take into account the entire course of dealings between the Government and the Sioux Tribe since the 1868 Treaty was signed. *United States v. Sioux Tribe,* 222 Ct.Cl. 421, 616 F.2d 485 (1980). The court allowed the liability award of some $44 million to stand. Thus, that part of the Indian Claims Commission decision became final and the law of the case. *See Temoak Band of Western Shoshone Indians v. United States,* 219 Ct.Cl. 346, 353, 593 F.2d 994, 998, *cert. denied,* 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). The Court of Claims thereafter remanded the case to its trial division (now the United States Claims Court) to determine the merits of the Government's claim for offsets, both payments on the claim offsets, as well as gratuitous offsets. It concluded:

> Since we conclude that the Commission erred in refusing to consider reducing the award by any payments on the claim or gratuitous offsets, the case must be remanded to the Trial Division to determine whether the award should be reduced. In so doing, we do not indicate any view on the application of particular payments to the cession of particular lands, or on the extent, if any, to which the award should be reduced. Those are matters for the trial judge to determine in the first instance. We hold only that the Commission erred in totally barring consideration of those items.

*United States v. Sioux Tribe, supra,* 222 Ct.Cl. at 433, 616 F.2d at 492 (1980).

Upon remand, this Court proceeded to dispose of major segments of the Government's offset claim by issuing several summary judgment opinions. The theory was that if the Court would issue a series of essentially legal rulings, the scope of any trial on the offsets issue would be substantially reduced if not eliminated. At the very least, the rulings would provide a road map for the parties to stipulate to most, if not all, of the facts.

In *Sioux Tribe of Indians v. United States,* 6 Cl.Ct. 91 (1984) (Summary Judgment Opinion I), this Court held that the Government had the right to proceed to prove its payment on the claim offsets because the 1868 Treaty was in major part a treaty of cession as opposed to peace. The Court cautioned, however, that the Government must be realistic in its claims and not overstep the time limits that were specified in the Treaty. For instance, no offsets would be allowed where Government expenditures were made on behalf of the Sioux Tribe later than 30 years from the date the Treaty was signed. This 30–year period reflected the outside time limit established in the various treaty provisions. Further, it was pointed out that certain expenditures were even further restricted by the Treaty. Article VII of the Treaty, dealing with educational benefits, was specifically stated to continue "not less than 20 years." Article IX allowed the Government to withdraw its support after 10 years. In addition to the time limits discussed, the Court also stated that no offsets would be allowed that could be considered to be agency expenses, nor would offsets relating to food, rations, and provisions be allowed. Thus, even though much of the Court's discussion in Summary Judgment Opinion I (SJ I) was *dicta,* it did provide a useful road map to the parties as to how the Court would ultimately rule as to specific segments of the Government's offset claim.

SJ I was followed by this Court's decision in *Sioux Tribe of Indians v. United States,* 7 Cl.Ct. 468 (1985) (Summary Judgment Opinion II). In that decision, this Court held that the Government could not deduct any gratuitous offsets from the existing liability award because:

> The entire course of dealings between the United States and the Sioux is marked, on the part of the Federal Government, primarily by broken promises, by the rapacious acquisition of land,

by the repeated sacrifice of Sioux rights to non-Indian interests, and by the oppression of Sioux society. The record, as a whole, and on balance, furnishes no justification for the allowance of gratuitous offsets to be applied against the plaintiff's land valuation award.

*Sioux Tribe of Indians v. United States, supra,* 7 Cl.Ct. at 481. Thus, after SJ I and II had been issued, the Government had been advised that it could no longer deduct *any* gratuitous offsets from the liability award, and that its payment on the claim offsets would be substantially reduced.

Next followed this Court's decision in *Sioux Tribe of Indians v. United States,* 7 Cl.Ct. 481 (1985) (SJ III). In that decision, the Court held that the Government could deduct, as a payment on the claim offset, some $2.7 million from the existing liability award, as the value of the Ponca land that was inadvertently incorporated into the Great Sioux Reservation set up pursuant to the 1868 Treaty. This $2.7 million figure ultimately formed approximately three-fourths of the total offset figure allowed by this Court's judgment of July 30, 1987.

Following these three summary judgment decisions, this Court issued its order that terminated Docket No. 74. *Sioux Tribe of Indians v. United States,* 8 Cl.Ct. 80 (1985). Without repeating the entire history that led up to this order, perhaps a brief synopsis would be helpful. Twice in the last 10 years, the parties' attorneys of record had negotiated an agreement as to the appropriate amounts to be deducted as Government offsets from the liability award. The first time was in 1979. However, the agreement was never consummated, primarily because most of the eight reservation tribes simply refused to consider the offer. Then in 1983, the parties again negotiated an agreement pertaining to the offsets. Again the reservation tribes simply refused to consider the offer. Viewing this as a failure to diligently prosecute its case, the Court ordered the Sioux Tribe's counsel to formally present the settlement offer to the eight reservation tribes' governing bodies and for those governing bodies to consider and act upon the negotiated settlement agreement. *Sioux Tribe of Indians v. United States,* 3 Cl.Ct. 536 (1983), *aff'd by unpublished order,* No. 84–635 (Fed.Cir. Jan. 5, 1984). Two of the eight tribes accepted the negotiated settlement agreement. Two tribes refused it outright with no explanation. Four of the tribes said no to the agreement, since it did not include return of some or all of its ancestral homelands. These four tribes also indicated their desire to withdraw from the Docket No. 74 litigation, since they were interested in recovering their land rather than in recovering a monetary award. *Sioux Tribe of Indians v. United States, supra,* 8 Cl.Ct. at 84. No motion to withdraw was ever presented to this Court, however, either before or after this occurrence. In any event, after the eight reservation tribes had filed their responses to the settlement agreement, it became clear to the Court that after some 35 years in active litigation, the case had reached an impasse. In an effort to break that impasse and to bring this matter to a conclusion in a fair and equitable way, this Court ordered the termination of the case, hoping that the parties would be convinced of the logic of the Court's decision. *Sioux Tribe of Indians v. United States, supra,* 8 Cl.Ct. at 90–92. However, that was not to be, as both parties (and several of the reservation tribes) soon appealed the decision to the Court of Appeals for the Federal Circuit.

In that appeal, the Federal Circuit held, quite appropriately, that this Court could not impose a settlement agreement on the parties to which the parties had not agreed. It therefore reversed and again remanded the case to this Court solely to complete the determination of offsets. *Cheyenne River Sioux Tribe et al. v. United States,* 806 F.2d 1046 (Fed.Cir.1986), *cert. denied, Oglala Sioux Tribe v. United States,* — U.S. —, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987). In its decision, however, the Federal Circuit did offer several helpful suggestions to assist the parties (and the Court) in bringing this case to an appropriate conclusion. It stated:

In vacating the judgment of the Claims Court and remanding for further proceedings, we are not suggesting that a complete trial on all of the offset issues will be required. We still urge the Claims Court to develop "innovative handling and treatment, perhaps to devise new procedures that will end the delays that have plagued these cases for so many years." *Navajo Tribe*, 601 F.2d at 540.

For example, perhaps the issues requiring trial can be further narrowed through decision of the three remaining motions for summary judgment and the resolution of any additional summary judgment motions that may be filed. The government may be able to prepare and present summaries of the different categories of offsets it is urging and thus avoid the need for the introduction into evidence of vast quantities of details and minute records going back for more than a century. Finally, the parties may be able to stipulate the total dollar amount of various categories of offsets to which the government is entitled. If the parties can so stipulate, this may be action that counsel for the Sioux Tribe can take as part of the normal conduct of litigation without the necessity for obtaining the approval of their clients. *Cf. Navajo Tribe*, 601 F.2d at 538–39.

*Cheyenne River Sioux Tribe et al. v. United States, supra*, 806 F.2d at 1053.

On remand, this Court, by order dated January 6, 1987, directed that both parties were to meet and discuss the status of the case on or before January 30, 1987, and were to take into consideration the suggestions for disposition offered by the Federal Circuit. Following that meeting, the parties were to file a proposed outline of disposition with the Court by February 20, 1987 and attend a status conference that was scheduled for March 5, 1987.

At the March 5, 1987 status conference, the parties discussed their respective proposals for disposition of this case. Both parties agreed that they should actively pursue agreement on as many of the facts as possible, and, to this end, requested the Court to advise them of its thinking on several of the matters of law that were still outstanding. The Court thereupon reiterated much of what it had already placed in writing in SJ I, *supra,* and had otherwise advised the parties of orally on numerous occasions. *See* Transcript of Proceedings, Docket No. 74, at 27–32 (March 5, 1987). One matter that had apparently not been addressed previously was whether Article X expenditures were made in lieu of prior treaties or were payments made on the 1868 Treaty. After listening to the respective arguments, the Court found that those expenditures were payments made on the 1868 Treaty. Following this Court's dialogue, the parties again believed that they had the necessary legal guidelines to go back and start putting together a stipulation of facts, hopefully to stipulate completely to the remaining facts pertaining to the offset issue, but, at any rate, to reduce significantly the scope of any necessary trial. The parties thereafter asked for further time to accomplish this goal, which was allowed, and the conference was closed. The Court issued its order to this effect the next day (March 6, 1987) stating in pertinent part:

After reiterating the Court's views on the various legal issues still outstanding, the parties were encouraged to voluntarily stipulate to all facts and matters that were possible, as suggested by the Federal Circuit's decision, *Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046, 1053 (1986). Since the Court received encouraging signs from the parties in this connection, it was ordered that the parties had 90 days to further explore these possibilities. Therefore, it was and is hereby ordered that:

1. The parties will file a status report on or before June 3, 1987; and

2. A status and procedures conference will be held at 2:00 p.m. on Monday, June 8, 1987, at the National Courts Building, 717 Madison Place, N.W., Washington, D.C.

Since it appears to the Court that the availability of the transcript of the proceedings of March 5, 1987, may be important for reference, the reporter was or-

dered to prepare the transcript for filing within five work days.

It is significant to note that attending the March 5, 1987 status conference were several representatives from the eight reservation tribes, notable among them was Mr. Joe American Horse, the current president of the Oglala Sioux Tribe, one of the two moving reservation tribes in this action. Mr. American Horse did not request to address the Court nor were any motions or statements made on his behalf at the conference.

Thereafter, on June 3, 1987, the parties filed a joint status report with the Court that reported optimistically that a stipulated resolution of this case was likely to occur. The parties had a draft of the agreement that the counsels for the plaintiff would execute and the Government's attorney would recommend to his appropriate supervisors. The parties pointed out that any stipulation of facts would be subject to the Court's approval as to matters of law. The status conference ordered for June 8, 1987 occurred on that date and the parties basically reiterated what had been reported earlier in the joint status report. Upon request, the parties were given 60 additional days to complete the necessary review procedures.

On July 29, 1987, the parties filed their completed Stipulation of Facts with the Court together with a Joint Motion for Entry of Judgment. On that day and the next, the Court reviewed the Stipulation of Facts for legal sufficiency and factual appropriateness. The stipulation was expressly made subject to the approval of the Court. The stipulation, in order to be effective, further required that the Court determine that the categories of offsets set forth in the stipulation were allowable as a matter of law. The stipulation thus provided, in substance, that if the Court determined the listed categories of offsets to be allowable as a matter of law, then the dollar amounts of these offsets were agreed upon by the parties to total $3,703,-892.98 as a matter of fact. Moreover, if the Court did not rule on the legal issues consistent with its prior opinions, the Stipulation of Facts would be null and void.

Pertinent parts of the Stipulation of Facts at issue read as follows:

6. This stipulation is made pursuant to the suggestion of the Federal Circuit Court of Appeals. *See,* also, transcript of proceedings before the Claims Court on March 5, 1987, at pp. 32, 35–36.

7. The Claims Court has indicated to the parties, clearly and in some detail, as to how it will rule on the remaining legal issues involving allowance of offsets. *See* 6 Cl.Ct. at 95–96; transcript of proceedings on March 5, 1987, at pp. 27–32.

8. Based upon the holdings of the Court, as set forth in paragraph 3, and the Court's further views about the applicable law, as set forth in paragraph 7, plaintiff and defendant stipulate that the United States is entitled to the following offsets on the Sioux 1868 Treaty claim:

| | |
|---|---|
| $2,669,762.20 | Land |
| $408,753.87 | Educational expenditures for 20 years |
| $28,572.68 | Article 8 Agriculture expenditures for 10 years |
| $415,135.99 | Article 10 expenditures exclusive of food, rations or provisions |
| $181,668.24 | Article 13 expenditures exclusive of stipulated educational payments that are duplicative |
| $3,703,892.98 | Total Offsets |

9. The parties intend that approval of this Stipulation of Facts by the Claims Court shall constitute its determination that the categories of offsets set forth in paragraph 8 are allowable as a matter of law.

10. Upon such approval by the Court, a final judgment may be entered in the sum of $40,245,807.02, which represents the gross award of $43,949,700 less payments on the claim of $3,703,892.98 in favor of the Sioux Tribe of Indians by its representatives, the Sioux Tribe of the Rosebud Indian Reservation, the Sioux Tribe of the Standing Rock Indian Reservation, the Sioux Tribe of the Pine Ridge Indian Reservation, the Sioux Tribe of the Cheyenne River Indian Reservation, the Sioux Tribe of the Crow Creek Indian Reservation, the Sioux Tribe of the Lower Brule Indian Reservation, the Sioux Tribe of the Santee Indian Reservation,

and the Sioux Tribe of the Fort Peck Indian Reservation.

11. This Stipulation of Facts shall be null and void unless it is approved by the Claims Court, as provided in paragraph 9, and unless the final judgment entered pursuant to paragraph 10 is based upon the precise figures set forth in paragraph 8. Subject to such approval and entry of final judgment, defendant withdraws without prejudice all offsets asserted in this case which do not constitute expenditures under the 1868 Sioux Treaty.

Respectfully submitted,

| For the Plaintiffs: | For the Defendant: |
|---|---|
| [Signature] | [Signature] |
| Arthur Lazarus, Jr., P.C. | Roger Marzulla Acting Assistant Attorney General |
| Fried, Frank, Harris, Shriver & Jacobson 1001 Pennsylvania Avenue, N.W. Suite 800 Washington, D.C. 20004 (202) 639–7000 | [Signature] Edward J. Passarelli Attorneys for Defendant U.S. Department of Justice Land and Natural Resources Division |
| Of Counsel: | Benjamin Franklin Station |
| Marvin J. Sonosky, Esquire William Howard Payne, Esquire | P.O. Box 663 Washington, D.C. 20044 (202) 633–2794 |

On July 30, 1987, this Court approved the Stipulation of Facts and directed the entry of judgment in the sum of $40,245,807.02, representing the liability award of $43,949,700 less the allowable offsets of $3,703,892.98. The Court thereafter entered a judgment in that amount on July 30, 1987.

At no time before this Court entered judgment did any one of the eight reservation tribes raise any legal or factual objection to the Federal Circuit's suggestion that counsel may be able to stipulate the facts in this case, or to this Court's endorsement and encouragement of the Federal Circuit's suggestion. Nor at any time prior to judgment has any one of the reservation tribes moved for leave to substitute counsel.

■ On September 23, 1987, the Oglala Sioux Tribe and the Rosebud Sioux Tribe, through outside counsel, filed a notice of appeal from the judgment. On September 28, 1987, the same two reservation tribes filed the current motion for relief from judgment with this Court.[3] None of the other six reservation tribes has joined in this motion.

*Discussion*

As indicated above, the current motion before the Court was filed by two of the eight reservation tribes (Oglala Sioux Tribe and Rosebud Sioux Tribe) that comprise the plaintiff in this case, the Sioux Tribe of Indians. The two reservation tribes (O/R tribes) contend in their motion that the attorney(s) of record in this case had no authority to enter into a Stipulation of Facts, which, when approved by this Court, formed the basis for the Court to order the final judgment herein. More specifically, movants argue that the Stipulation of Facts was really a settlement agreement which was not authorized by the O/R tribes. Moreover, they assert that substantial legal, moral, and political interests of the tribes would be harmed if the judgment is not vacated.

Both the plaintiff in this action and the Government oppose the motion by arguing three basic points. First, they argue that the movants have confused the difference between a stipulation of facts entered into between the attorneys of record for the parties and a settlement agreement. Here, the attorneys of record assert that the parties have entered into a stipulation of facts, and a rather minimal one at that, which in

---

**3.** Any potential jurisdictional problem with this Court's authority to proceed with the pending motion for relief from judgment has been removed since the Federal Circuit has already dismissed the two reservation tribes' appeal as premature. *Oglala Sioux Tribe and Rosebud Sioux Tribe v. Sioux Tribe of Indians and The United States,* Appeal Docket 87–1634 (Fed.Cir. Nov. 5, 1987) (unpublished). *See also Yachts America, Inc. v. United States,* 8 Cl.Ct. 278, 280–81, *aff'd,* 779 F.2d 656, 662 (1985), *cert. denied, Wilson v. United States,* — U.S. —, 107 S.Ct. 122, 93 L.Ed.2d 68 (1986).

no way can be considered a settlement of this case, especially when placed in the proper context of a case that has been actively litigated for some 37 years. Secondly, both parties contend that it is far too late in the game for the movants to contest the authority of the attorney(s) of record for the plaintiff to act on the plaintiff's behalf. The Sioux Tribe and the Government question the movants' standing to object at this final stage and point out that prior to the entry of judgment there has never been a motion filed by the movants to substitute new counsel. Nor has there ever been filed with this Court a motion to voluntarily dismiss this case. Third and finally, both parties assert that the plaintiff tribe is not aggrieved. They point out that six of the eight reservation tribes have not joined in the motion, thus apparently disagreeing with the movants' goals. Further, the parties state, assuming the motive for the motion is to keep the case alive until Congress agrees to return some or all of their ancestral land, that even after a judgment the movant tribes may still petition the Congress for that purpose. Therefore, the parties conclude that the plaintiff tribe has not been aggrieved by the judgment, and that, in fact, the judgment is completely in its best interests.

■ USCC Rule 60(b) states in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; * * * or (6) any other reason justifying relief from the operation of the judgment.

A motion for relief from judgment is one for extraordinary relief entrusted to the discretion of the Court, *United States v. Atkinson,* 748 F.2d 659, 660 (Fed.Cir.1984), which may be granted only in exceptional circumstances, *Washington Medical Center, Inc. v. United States,* 211 Ct.Cl. 379, 380 (1977). Viewing the moving parties' motion in light of those standards, this Court concludes that the motion should be denied and that the judgment should stand.

■ When it remanded this case last December to this Court for a determination of offsets, the Court of Appeals for the Federal Circuit suggested that "the parties may be able to stipulate the total dollar amount of various categories of offsets to which the government is entitled. If the parties can so stipulate, this may be action that counsel for the Sioux Tribe can take as part of the normal conduct of litigation without the necessity of obtaining the approval of their clients." *Cheyenne River Sioux Tribe v. United States, supra,* 806 F.2d at 1053. On remand, this Court, in its order filed March 6, 1987, *supra,* at 12–13, strongly urged counsel of record to follow the Federal Circuit's recommendation concerning stipulations of fact ("the parties were encouraged to voluntarily stipulate to all facts and matters that were possible, as suggested by the Federal Circuit's decision * * *.").

Movants here contend, in effect, that the judgment of this Court is void because the attorney(s) of record for the Sioux Tribe actually followed the suggestion of the Court of Appeals, which this Court endorsed and encouraged. Movants' argument as to the judgment's alleged invalidity certainly is unique, but hardly is persuasive. As the discussion below will demonstrate, a Stipulation of Facts was entered into by counsel "as part of the normal conduct of litigation" and clearly was not a settlement agreement.

The nature of this Stipulation of Facts can best be understood, of course, in context. Briefly stated, after some 27 years of difficult and intensive litigation, the Indian Claims Commission nine years ago entered a liability award in this case of $43,-949,700 in favor of the Sioux Tribe of Indians, free of all offsets. *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 214, 257 (1978). The Government appealed solely on the question of offsets. The Court of Claims reversed and remanded the case for trial to determine the merits of the defendant's claim for offsets, both payments on the claim and gratuitous offsets, as the sole remaining issue. *United States v.*

*Sioux Tribe,* 222 Ct.Cl. 421, 616 F.2d 485 (1980).

By 1980, therefore, all issues with respect to the Commission's jurisdiction to hear the 1868 Treaty claim had been litigated and resolved. All issues with respect to Sioux land title had been litigated and resolved. All issues with respect to the overlapping claims of other Indian tribes had been litigated and resolved. All issues with respect to the Government's liability had been litigated and resolved. All issues with respect to the value of the Sioux lands acquired by the United States had been litigated and resolved. These were incredibly complex matters that were resolved by litigation and final opinions. The sole remaining issue was the amount of allowable offsets.

By the time of the entry of final judgment in July of 1987, the offset question had been pending before this Court for an additional seven years. During that period, the parties and the Court were not idle. Following a trial session on the historical aspects of this case (May 10–13, 1982), and after extensive briefing, the Court ruled in several summary judgment decisions, that the defendant was not entitled to deduct any gratuitous offsets, but that the defendant was entitled to deduct $2,669,762.20, representing the value of land (Ponca land) that the United States inadvertently had conveyed to the Sioux Tribe. *Sioux Tribe of Indians v. United States,* 7 Cl.Ct. 468 (1985); *Sioux Tribe of Indians v. United States,* 7 Cl.Ct. 481 (1985). The Court also denied the Sioux Tribe's claim that a portion of the Government's expenditures was for peace and not for land. *Sioux Tribe of Indians v. United States,* 6 Cl.Ct. 91 (1984).

In addition to the foregoing holdings, the Court had indicated to the parties in some detail, by way of *dicta,* as to how it would rule on virtually all of the remaining legal issues involving the allowance of offsets. *See* SJ I, 6 Cl.Ct. at 95–96. After the remand by the Federal Circuit in *Cheyenne River Sioux Tribe v. United States, supra,* and specifically in order to facilitate stipulation, the Court again reiterated and expanded upon its prior expressions of opinion concerning the allowability of offsets. *See* Transcript of Proceedings before the Court on March 5, 1987, at 27–32. Counsel, therefore, had clear-cut legal guidelines from the Court as to all outstanding legal issues when they first approached the subject of a fact stipulation. Also, it was this status conference which Mr. Joe American Horse, the current president of the Oglala Sioux Tribe, and several other representatives of the other reservation tribes, attended. The movants were clearly made aware of the Federal Circuit's decision and suggestions in this matter, as well as this Court's views regarding the same. Knowing this information, they still took no action until after the judgment had been entered by this Court.

The Stipulation of Facts actually entered into by the Sioux Tribe, through its attorney(s) of record, and the United States was made expressly "subject to the approval of the Court." In order to become effective, the stipulation further required that the Court determine that the categories of offsets set forth in the stipulation were allowable as a matter of law. *See* paragraph 9 of the Stipulation of Facts, *supra.* The stipulation thus provided, in substance, that *if* the Court determined the listed categories of offsets to be allowable as a matter of law, then the dollar amounts of those offsets were agreed upon by the parties to total $3,703,892.98 as a matter of fact.[4] Moreover, if the Court did not rule on the legal issues consistent with its prior opinions, the Stipulation of Facts would be "null and void." Stip. ¶ 11, *supra.*

---

4. Stip., ¶¶ 8, 11, *supra.* As the attorney of record for the Sioux Tribe pointed out to the Court: "[W]hat the stipulation does, is assume that Your Honor will find, as a matter of law, that which you indicated in your comments from the bench and in your prior opinion, you believed to be the law in this case. Assuming that is your ruling, here are the offsets that the parties have agreed to and we will have agreed to all of them." Transcript of Proceedings before the Claims Court on June 8, 1987, at 4; *see also* remarks of Edward Passarelli, Government counsel (*id.* at 9) and Joint Status Report of June 3, 1987.

The Stipulation of Facts shows on its face that the role of counsel was limited to allocating dollar amounts to defined categories of offsets allowed by the Court. Indeed, counsel's role was even more circumscribed than it superficially appears. Out of the $3,703,892.98 in agreed offsets, $2,669,762.20 had already been determined by the Court to be a proper deduction. *See* SJ II, *supra,* 7 Cl.Ct. at 492. The remaining $1,034,130.78 in offsets, which were the true subject of the stipulation, represent about two percent of the liability award, a relatively insubstantial figure, and only approximately one quarter of the offset amount that was actually agreed to by the parties.

Counsel, of course, did not stipulate to the offsets in a vacuum. The Government's expenditures were shown in the Government's multi-volume GAO accounting report and had been classified by the Sioux Tribe's accountant, Mr. Paul Gillis, who has served as an expert witness in a number of cases before the Commission and this Court. The stipulated figures, insofar as they reasonably could be ascertained, did not include any money which was not allowable as an offset under the rulings of the Court. Significantly, the movants have not challenged the amounts stipulated to by the parties in offsets, *i.e.,* $1,034,130.78.

Given these circumstances and the advanced status of the case, as described above, counsel's agreement that $1,034,-130.78 represented the dollar amount of disputed offsets was exactly the type of determination (*i.e.,* analysis of the evidence) that attorneys can undertake "as part of the normal conduct of litigation without the necessity for obtaining the approval of their clients." *Cheyenne River Sioux Tribe v. United States, supra,* 806 F.2d at 1053. *See Lipp v. National Screen Service Corp.,* 290 F.2d 321, 322 (3d Cir.), *cert. denied,* 368 U.S. 385, 82 S.Ct. 61, 7 L.Ed.2d 36 (1961) ("There is no doubt in our minds that this arrangement to expedite this litigation to final conclusion was well within the authority of the lawyers who participated."); *United States v. Texas,* 523 F.Supp. 703, 711 (E.D.Tex.1981) ("The en-

tering into evidentiary stipulations, before or during trial, falls squarely within an attorney's sphere of authorized conduct."); *Gottwals v. Rencher,* 60 Nev. 35, 98 P.2d 481, 484 (1940) ("Stipulations by respective counsel as to evidence to take the place of formal proof have always been common practice.").

The Stipulation of Facts in this case led to the entry of a final judgment by the Court. This result followed not because judgment was entered upon the stipulation, but rather because, after the Court's ruling as to the offsets allowable as a matter of law and the Court's subsequent approval of the agreed offset amounts, no issue remained in the case to litigate. It would be bizarre indeed if the Court were to allow this case to remain open and on its docket when nothing more needed to be resolved. Thus, the Stipulation of Facts did no more than eliminate the need for trial on a finite, easily resolvable factual question—the dollar amount of described Government expenditures—and in no way effected a compromise or settlement of the overall 1868 Treaty claim.

In short, in the overall context of this incredibly complex and long-standing case, the Stipulation of Facts played a minor part. It was this Court that entered the judgment after it was convinced that the $1,034,130.78 that the parties had stipulated to in good faith was appropriate as a matter of law and fact. It can in no way be considered to be a settlement agreement entered into without authority, under the circumstances present here.

█ The second matter for discussion relates to the timeliness of the movant tribes' motion. In their motion, the movants have alleged that the attorney(s) of record for the plaintiff tribe were not authorized to represent them in this litigation, and thus they were not authorized to enter into the Stipulation of Facts with the Government in this case. The movants have attached affidavits to their motion which indicate that the two tribes did not renew their attorney contracts with the attorney(s) of record in this case when they expired in the

early 1980's. They also attach several resolutions passed during the early and middle 1980's by the movant tribes' governing bodies, which indicated that the two tribes wished to recover their ancestral land and that they did not wish the attorney(s) of record to act in any way contrary to this desire.

The problem with this information, however, is not that it did not exist; the problem is that the two movant parties did not act on this information in an appropriate or timely manner consistent with the Rules of this Court. They neither moved to substitute new attorneys nor moved to dismiss this action. The real question thus becomes, where were the movant parties for the 37 long years that this case has been in hotly contested litigation?

From the beginning of this case 37 years ago until the entry of judgment, the eight Sioux tribal representatives, including the movants, acted together through the attorney of record and his predecessor counsel, in the prosecution of the 1868 Treaty claim before the Indian Claims Commission, the Court of Claims, and ultimately this Court. At no time during any proceedings at the trial court level did either movant party seek separate legal representation, or raise any new and different legal or factual issues, or in any other way take an independent legal position.

Indeed, for seven years preceding the judgment of July 30, 1987, the Oglala Sioux Tribe had an open invitation from this Court to substitute counsel, an invitation which the Tribe rejected. More specifically, in 1980 the attorney of record moved for leave to withdraw as attorney for the Oglala Sioux Tribe in this case for the reasons stated in the motion. (Motion filed September 17, 1980.) The Oglala Sioux Tribe never responded. The Court thereafter denied the motion, "although supported by good cause," with the right to renew "at such time that the Oglala Sioux Tribe seeks by appropriate motion to make a proper sub-

stitution of counsel." (Order filed October 9, 1980.) Mr. Joe American Horse, the vice president (now president) of the Tribe, upon receipt of the order, wrote personally to this Court by letter dated October 27, 1980. *See* Appendix A, attached without enclosures. The Court answered by letter dated December 2, 1980, advising the vice president in pertinent part:

> Please be advised that the effect of my order of October 9, 1980 regarding Mr. Lazarus' motion for leave to withdraw as counsel for the Oglala Sioux Tribe was that Mr. Lazarus would not be allowed to withdraw as the Oglala Sioux Tribe's counsel until such time as the Oglala Sioux Tribe filed an appropriate substitution of attorney motion with this Court pursuant to Rule 203(c). In short, if the Oglala Sioux Tribe wishes to change their attorney in this litigation, they must take affirmative action by filing with me a motion for substitution of attorney. Until the Oglala Sioux Tribe takes that step, Mr. Lazarus will remain to protect the interests of the Oglala Sioux Tribe as its counsel.

*See* Appendix B attached. Prior to the judgment being issued in this case, the Oglala Sioux Tribe had never moved to substitute counsel in this case.[5]

In 1985, on the same day that the Oglala Sioux Tribe and the Cheyenne River Sioux Tribe filed appeals from this Court's entry of judgment for $39,749,700, *Sioux Tribe of Indians v. United States*, 8 Cl.Ct. 80 (1985), the attorney of record (Mr. Lazarus) again moved for leave to temporarily withdraw as counsel for the two tribes, pending resolution of the appeals. (Motion filed April 23, 1985.) Again the Oglala Sioux Tribe ignored the motion. Again the Court denied the motion without prejudice. (Order filed April 24, 1985.)

The salient point is that neither movant party has ever asked this Court to substitute new counsel, or sought to enter a separate appearance, or otherwise attempted to assert through legal process a posi-

---

**5.** Until the entry of judgment, the Rosebud Sioux Tribe also had never expressed the slightest dissatisfaction with the conduct of this litigation by counsel—in this Court or in the appel-

late courts. Accordingly, no question about the attorney(s) of record's continuing authority to represent that tribe ever arose.

tion independent of the Sioux Tribe and of the six other Sioux reservation tribes in these proceedings.[6] It is too late in the game to do this now. Having failed over a 37-year period to raise any substantive objection to what was happening, the Oglala Sioux Tribe and the Rosebud Sioux Tribe now are precluded and estopped from initiating their belated attack upon the judgment of this Court, an attack in which the Sioux Tribe and the six other Sioux tribal representatives do not join.[7] As the Court of Claims observed in a different context, but when faced with a substantial change in litigation strategy by the tribal plaintiff "after 25 years," that course "when the goal of final adjudication is in sight cannot be." *Temoak Band of Western Shoshone Indians v. United States*, 219 Ct.Cl. 346, 354, 593 F.2d 994, 998, *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). *See also Western Shoshone v. United States*, 209 Ct.Cl. 43, 531 F.2d 495, *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). These two *Western Shoshone* cases stand for the proposition that litigants cannot be a party to a massively litigated case for a long period of time, and then file motions at the last possible moment that would entirely change the litigation focus of the case. It simply will not be allowed for all of the reasons discussed in those two cases. The movant parties do not prevail on their lack of authority arguments here.

The third and last matter that should be addressed is the plaintiff counsel's argument that the movants are not aggrieved by the money judgment in this case. Counsel points to the fact that six of the eight reservation tribes have not joined the movants in their motion, which presumably can be read to mean that they are satisfied with the amount and adequacy of the money judgment. Also, counsel points to the fact that nowhere in the motion is there any hint that the movants themselves are dissatisfied with the amount of the

money judgment. The real motivation for the motion, counsel claims, is that the movants do not want this long-lived dispute to come to a conclusion. The movants want this case to stay open as a bargaining chip so that they may convince the Congress at some future point in time to return some or all of their ancestral land.

Indeed, the plaintiff's counsel is quite correct in this assertion. The movants simply want their ancestral land returned. Hence, in their motion, they allege that "substantial legal, moral and political interests of the tribes would be harmed if the judgment is not vacated." Memorandum in Support of O/R Motion at 2.

In 1950, when this action was commenced, all eight reservation tribes brought suit under the authority of the Indian Claims Commission Act to recover a money judgment on behalf of the land-owning, treaty-signing Sioux Tribe of Indians. There was no hint that they brought suit seeking a return of their land, nor for that matter, was there any authority under which they could sue for the return of their land under the Act. For 37 years, the case went forward with the only possibility being a money judgment to compensate the Sioux Indians for the inadequate compensation accorded them in the 1868 Treaty. It is simply too late to change horses now. This Court will not allow this case to be kept open and held hostage while the movant reservation tribes pursue their pipe dream of negotiating a return of their land. Even after a money judgment is ordered, of course, the movant tribes will remain free to pursue this goal.

It is not for this Court to say whether the Congress of the United States will ever decide to return some or all of the Sioux land. It is, however, up to this Court to say that this case has come to an end. The attorney(s) of record in this case have liti-

6. On November 2, 1987, the movant parties finally filed a motion with this Court to change their attorney of record.

7. Although the plaintiff's attorney of record (and the Government) asserts that the movants

lack standing to even raise these issues with the Court, the Court chooses to address the merits of the movants' arguments and finds them inadequate for the reasons discussed herein.

gated this matter with uncommon skill and devotion to their clients and the result has been beneficial to them. They have not been aggrieved by the judgment. This being the case, the motion for relief from the judgment is hereby denied. The judgment, as issued on July 30, 1987, will stand.

## CONCLUSION

For the reasons discussed above, the movants' motion for relief from the judgment under USCC Rule 60(b) is hereby denied.

Each party to bear its own costs.

## APPENDIX A

# Oglala Sioux Tribe

Phone (605) 867-5821
Box 468
Pine Ridge, South Dakota 57770

STANLEY LOOKING ELK
President
JOE AMERICAN HORSE
Vice President
BERNADINE BLUE BIRD
Secretary
MYRON ROCK
Treasurer
LYMAN RED CLOUD, SR.
Fifth Member

October 27, 1980

Honorable Robert J. Yock
Trial Judge
U.S. Court of Claims
Washington, D.C.

RE: Docket No. 74 (Black Hills case)

Dear Judge Yock:

I am in receipt of a letter dated October 14, 1980 with an attached order entitled "Trial Judge's Order to Motion for Leave to Withdraw as Counsel for Oglala Sioux Tribe" filed by you and signed on October 9, 1980.

The position of the Oglala Sioux Tribe is as stated in Executive Board Resolution No. 80-51XB, a copy of which is enclosed for your information. Mr. Lazarus is well aware of this position since hi- firm routinely obtains copies of all minutes and resolutions of the Oglala Sioux Tribal Council and the Executive Committee.

Please file a copy of this correspondence in the official court file of the above-named case.

Sincerely,

JOE AMERICAN HORSE
Vice-President

Enclosure

cc:  U.S. Attorney General
     Arthur Lazarus
     Marvin J. Sonosky
     William H. Payne
     Clarence Skye

APPENDIX B

### United States Court of Claims
717 MADISON PLACE. N.W.
WASHINGTON. D.C. 20005

December 2, 1983

Mr. Joe American Horse
Vice-President
Oglala Sioux Tribe
Box 468
Pine Ridge, South Dakota 57770

    Re: The Sioux Tribe of Indians, et al. v. United States
        No. 74 (Fort Laramie Treaty Lands)

Dear Mr. American Horse:

    The undersigned trial judge is in receipt of your letter
of October 27, 1980, in which you have attached Resolution
No. 80-51XB, and have stated your belief that Mr. Lazarus
is aware of this position as it pertains to this case,
Docket No. 74.

    Please be advised that the effect of my order of
October 9, 1980 regarding Mr. Lazarus' motion for leave
to withdraw as counsel for the Oglala Sioux Tribe was
that Mr. Lazarus would not be allowed to withdraw as the
Oglala Sioux Tribe's counsel until such time as the Oglala
Sioux Tribe filed an appropriate substitution of attorney
motion with this Court pursuant to Rule 203(c). In short,
if the Oglala Sioux Tribe wishes to change their attorney
in this litigation, they must take affirmative action by
filing with me a motion for substitution of attorney. Until
the Oglala Sioux Tribe takes that step, Mr. Lazarus will
remain to protect the interests of the Oglala Sioux Tribe
as its counsel.

                  Sincerely,

                  Robert J. Yock (signed)

                  Robert J. Yock
                  Trial Judge

cc: Arthur Lazarus, Esq.
    Marvin Sonosky, Esq.
    Craig A. Decker, Esq.
    Mr. Stanley Looking Elk, President
    Ms. Bernadine Blue Bird, Secretary